328 F.2d 190
 TWENTIETH CENTURY FOX FILM CORPORATION, Fox West Coast Theatres Corporation, Fox West Coast Agency Corporation and National Theatres Corporation, Defendant-Appellants,
v.
Samuel GOLDWYN, Francis Howard Goldwyn, Samuel Goldwyn, Jr., James A. Mulvey and Ben Fish, doing business as Goldwyn Productions, a limited partnership, Plaintiff-Appellees.
 No. 17725.
 United States Court of Appeals Ninth Circuit.
 January 24, 1964.
 Rehearing Denied March 12, 1964.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Dunne, Bledsoe, Smith, Phelps, Cathcart & Johnson and Arthur B. Dunne, San Francisco, Cal., Royall, Koegel & Rogers and Frederick W. R. Pride, New York City, O'Melveny & Myers and Bennett W. Priest, Los Angeles, Cal., for appellants-appellees.
 Joseph L. Alioto, San Francisco, Cal., George Slaff, Los Angeles, Cal., Maxwell Keith, and Matthew P. Mitchell, San Francisco, Cal., for appellees-appellants.
 Before POPE, HAMLEY and BROWNING, Circuit Judges.
 HAMLEY, Circuit Judge.
 
 
 1
 This is a suit by a motion picture producer against motion picture exhibitors and their agents to recover damages for, and obtain injunctive relief from, asserted violations of sections 1 and 2 of the Sherman Act.[1] Damages were claimed in the sum of $2,250,000, trebled to $6,750,000. Jurisdiction was asserted under sections 4 and 16 of the Clayton Act.[2]
 
 
 2
 The action was commenced on May 16, 1950, by Samuel Goldwyn Productions, Inc.[3] Nine corporations and three individuals were named defendants. Five of the corporate defendants and two of the individual defendants were granted a separate trial.[4] The third individual defendant, Charles P. Skouras, died on October 22, 1954, and the action was discontinued as to him.
 
 
 3
 The four defendants remaining in the case for this trial are the so-called "Fox defendants": Twentieth Century Fox Film Corporation (Twentieth Century Fox), National Theatres Corporation (National), Fox West Coast Theatres Corporation (Fox West Coast) and Fox West Coast Agency Corporation (Fox West Coast Agency).
 
 
 4
 Twentieth Century Fox, the parent corporation in this group,[5] is an integrated producer, distributor and exhibitor of motion pictures. National, in addition to its control of Fox West Coast, operates motion picture theatres in the middle and far western states through other subsidiary operating corporations. Fox West Coast is engaged in the management and control of theatres in California, Arizona, Montana and Nevada. Fox West Coast Agency is in the business of buying and booking motion picture films for those theatres which are operated directly or indirectly by Fox West Coast.[6] Motion picture theatres operated or controlled by Twentieth Century Fox, National and Fox West Coast comprise the "Fox Circuit."
 
 
 5
 It was alleged in the complaint that, beginning in 1925 and continuing to the date the action was commenced, defendants and others acting in concert with them unlawfully entered into contracts, combinations and conspiracies to monopolize and restrain trade in the interstate licensing and exhibition of motion pictures, and that they did monopolize and restrain, and attempted to monopolize and restrain such trade. It was alleged, more particularly, that the asserted contracts, combinations and conspiracies dealt with the six kinds of undertakings set out in the margin.[7] The specific objectives of the asserted contracts, combinations and conspiracies, it was alleged, were to: (a) establish, increase, maintain and perpetuate a monopolistic buying power of motion picture theatres, (b) negotiate for the film licenses on a collective basis, and (c) depreciate film rental paid to producers.
 
 
 6
 With regard to twenty-eight motion pictures produced by the plaintiff or its predecessor in interest during the period of the asserted contracts, combinations and conspiracies, it was alleged, the violations complained of depreciated the value of the pictures, lessened the fees paid under the licenses, and substantially injured and impaired the good will attaching to the producing company and to the picture.
 
 
 7
 The answer filed by the Fox defendants consisted of a general denial as to the critical allegations of the complaint, together with eight affirmative defenses including defenses relying on the one-and three-year California statutes of limitations, laches, and the principle of pari delicto. Discovery and other pretrial proceedings, interspersed with long periods of inaction insofar as the record reveals, consumed the period from November, 1950 to June, 1956.
 
 
 8
 On July 12, 1956, the Fox defendants moved for partial summary judgment dismissing plaintiff's claims which had accrued prior to May 16, 1947 on the ground that such claims were barred by the three-year California statute of limitations.[8] This motion was argued before The Honorable Edward P. Murphy, to whom the case had been assigned. On October 3, 1956, Judge Murphy entered an order granting defendants' motion for a partial summary judgment dismissing all claims which accrued prior to May 16, 1947. Samuel Goldwyn Productions, Inc. v. Fox West Coast Theatres Corp., N.D.Cal., 146 F.Supp. 905.[9]
 
 
 9
 The case was tried before Judge Murphy, without a jury, beginning on July 10, 1957 and continuing intermittently until January 14, 1958, when both sides rested. On December 13, 1958, before the cause was argued or submitted, Judge Murphy died. On July 28, 1959, the cause was reassigned to The Honorable George B. Harris for all further proceedings. Pursuant to stipulation, the cause was submitted to Judge Harris for decision on the record before Judge Murphy. The date of final submission was April 10, 1961.
 
 
 10
 On May 4, 1961, Judge Harris filed his memorandum opinion holding the Fox defendants liable to plaintiff for the injuries caused by what the court found to be defendants' violations of the antitrust laws between May 16, 1947 and May 16, 1950. On May 31, 1961, Judge Harris filed his supplemental opinion holding that plaintiff was entitled to actual damages in the sum of $100,000, to be trebled to $300,000. Attorneys' fees in an amount not then specified were also allowed. These opinions were reported in Samuel Goldwyn Productions, Inc. v. Fox West Coast Theatres Corp., N.D.Cal., 194 F.Supp. 507, 513. Attorneys' fees in the amount of $100,000 were thereafter allowed plaintiff.
 
 
 11
 Findings of fact, conclusions of law and a judgment were entered on September 20, 1961. In the findings of fact the court described how Twentieth Century Fox had acquired its interest in theatres,[10] and depicted in detail the extent of the theatre holdings which evolved.[11] Other theatre groups were described.[12] The procedures were explained under which the licensing of all film used in the Fox Circuit was centralized in National's Los Angeles office.[13] Also described were the methods instituted by National under which it controlled price and playing time for films.[14]
 
 
 12
 In the findings of fact the ways in which National restrained trade and eliminated competition are then detailed at great length. Three principal methods by which this was accomplished are described. The first of these was through the joint operation or ownership of theatres with other exhibitors. The second method had to do with activities by National, through its subsidiaries, in excluding actual and potential competition. The third method related to the agreements entered into by the Fox Circuit with competitive exhibitors not to compete in the licensing of films, but to split or divide the product.
 
 
 13
 Following a description of these methods by which National restrained trade and eliminated competition, there are findings dealing specifically with the way in which National used its circuit buying power in the licensing of plaintiff's seven pictures which were marketed during 1947 to 1950. These pictures, the titles of which will be abbreviated elsewhere in the opinion, were: THE SECRET LIFE OF WALTER MITTY, THE BISHOP'S WIFE, THE BEST YEARS OF OUR LIVES (regular release), A SONG IS BORN, ENCHANTMENT, ROSEANNA McCOY and MY FOOLISH HEART. The final twenty-seven paragraphs of the findings deal with the question of damages.
 
 
 14
 On the basis of the findings of fact the district court entered conclusions of law setting out twelve different ways in which defendants had violated the Sherman Act. According to these conclusions of law, the objective of the described interests, relationships, arrangements and activities was the elimination of competition in the exhibition of motion pictures. This objective was accomplished by concentrating buying power in National, eliminating competitive bidding, dividing and allocating products, granting the right of first refusal and first right to negotiate for film licensing, fixing clearance schedules, and by various other means.
 
 
 15
 Judgment was entered in accordance with the findings and conclusions and in keeping with the opinion which the court had rendered. The Fox defendants appealed and plaintiff cross appealed.[15]
 
 
 16
 On their appeals, defendants argue five points: (1) the district court erred in holding that plaintiff had been damaged by any violations of the Sherman Act; (2) no liability was proved as to Twentieth Century Fox; (3) the court erroneously applied the three-year California statute of limitations because the one-year statute should have been applied; (4) the court awarded excessive attorneys' fees; and (5) the court erroneously allowed certain items of cost.
 
 
 17
 On the cross appeal, plaintiff argues three points: (1) the court erred in limiting plaintiff, as to defendants Twentieth Century Fox and National, to claims arising on and after May 16, 1947; (2) the court erred in excluding from the evidence the findings of fact, conclusions of law, judgments and decrees in the Paramount case, and (3) the finding of fact that plaintiff's actual damages for the period from May 16, 1947 to May 16, 1950, is clearly erroneous because such damages greatly exceeded that figure.
 
 
 18
 Liability — Particular Practices, Relationships and Corporate Interests
 
 
 19
 Defendants contend that none of the practices, relationships or interests examined into during the trial involved any violation of the Sherman Act, or at least any violation which could have adversely affected plaintiff. Discussing each such practice, relationship and interest, defendants assert either that the evidence does not support the finding made, or that the facts found reveal no violation of the Sherman Act, or that plaintiff was not adversely affected.
 
 
 20
 We will discuss these practices, relationships and interests individually. In the course of doing so, we will also deal with defendants' related presentation of facts and arguments concerning the individual Goldwyn pictures marketed during 1947 to 1950, and the negotiations for their licensing.
 
 
 21
 Circuit key and lump sum deals.[16] The district court found that circuit key and lump sum deals were made by the central buying office of National for the entire circuit with various distributions. On some circuit key deals or lump sum deals, the court found, allocations were made from National's central buying office in Los Angeles of the amounts to be paid by the various divisions of National. Defendants argue that these practices could have had no adverse effect upon plaintiff.
 
 
 22
 First, they assert, there is no finding that such a deal was made for any of the Goldwyn pictures. While this is true with regard to circuit key deals, the district court did find that RKO, which was plaintiff's distributor, requested but could not obtain percentage terms for the Goldwyn pictures, being compelled to accept flat rental terms. Moreover, as will later appear, Goldwyn pictures could be and were, adversely affected by circuit key and lump sum deals which, according to the findings, were entered into with the distributors of other pictures.
 
 
 23
 Defendants further argue that, to the extent that any such deals may violate the antitrust laws, it is because of their impact on other exhibitors, not because they are prejudicial to the distributor who agreed to them. Our attention is also called to language in United States v. Paramount Pictures, Inc., 334 U.S. 131, 155, 68 S.Ct. 915, 928, 92 L.Ed. 1260, where such arrangements were referred to as "formula deals," and where the Supreme Court said:
 
 
 24
 "It is hardly necessary to add that distributors who join in such arrangements by exhibitors are active participants in effectuating a restaint of trade and a monopolistic practice."
 
 
 25
 In Paramount, the Supreme Court held that such deals, made for an entire circuit, constitute restraint of trade in two respects. They eliminate the possibility of bidding for films theatre by theatre, and they represent a pooling of the purchasing power of an entire circuit in bidding for films, thereby constituting a misuse of monopoly power. This misuse, the court indicated, arises from the fact that a circuit having a complete monopoly of theatres in any one town,[17] can use a circuit key deal or lump sum deal to acquire exclusive privileges in a city where it has competitors.[18]
 
 
 26
 The direct adverse impact of such deals is upon non-circuit exhibitors, since they are placed at a disadvantage in bargaining for pictures. A producer who distributes his films pursuant to such arrangements may actually benefit therefrom, if the terms are sufficiently favorable.
 
 
 27
 But much of plaintiff's case is based upon the asserted monopoly power wielded by defendants, and the alleged ways in which it was exerted to plaintiff's disadvantage. There are numerous findings of fact sustaining plaintiff in both of these respects. The findings that National entered into circuit key deals and lump sum deals are relevant to this aspect of the case. They indicate one way in which National was able to enlarge and solidify its monopoly beyond the bounds of actual ownership.[19]
 
 
 28
 They also provide one explanation of why plaintiff had difficulty in licensing MY FOOLISH HEART and ROSEANNA McCOY in the Fox Circuit,[20] and why plaintiff was denied the opportunity to deal with National's competitors in "open" towns if it expected to sell to National in "closed" towns.[21] Lastly, it reveals a practice whereby National could obtain more favorable film rental terms than might otherwise have been possible.
 
 
 29
 For the reasons stated, we are of the view that National's participation in circuit key deals and lump sum deals, while perhaps not giving rise to direct and independent items of damage, tends to support the charge that monopoly power was misused. Such participation, therefore, was one of the underlying causes of any damage sustained by plaintiff by reason of defendants' use of their monopoly power in the field of motion picture exhibition.
 
 
 30
 Classification of pictures. The district court found that National agreed with distributors on "brackets" or "classifications" of pictures, specifying for the pictures in each bracket the terms for each theatre and thereby confining negotiations to a determination of the bracket in which a picture was to be placed. The court found that when this was agreed upon, the terms to be paid by National were automatically determined by the bracket into which the picture fell.
 
 
 31
 Defendants argue that this practice could have had no adverse effect upon plaintiff. They contend that this was only a mechanical means of simplifying deals for run-of-the-mill "program" pictures. If a distributor wanted to negotiate this way, defendants contend, this was his privilege, and if he did he was in no position to complain. In any event, defendants assert, this system was not used in licensing any of the Goldwyn pictures.[22]
 
 
 32
 We have not discovered, in the voluminous briefs, any response by plaintiff to this argument. The utilization of such a classification system could operate to narrow the area for negotiation. It obviates theatre-by-theatre consideration in negotiating for the price of individual pictures, leaving only the question of the proper price classification for agreement. But this would be true only if the system were imposed on the opposite negotiating party.
 
 
 33
 Here the testimony indicates that the classifications were arrived at by agreement between National and the distributors, and only for mutual convenience. Thus, entirely apart from the question of whether Goldwyn Pictures were negotiated on such a basis, we cannot perceive how this particular practice could have had a direct or indirect impact upon plaintiff. We need not decide whether such a system could be so employed as to constitute a violation of the Sherman Act — it was not as to this plaintiff.
 
 
 34
 Runs and clearances.[23] Twelve paragraphs of the findings of fact are devoted to runs and clearances. The district court found that producers of motion pictures when attempting to bargain with the Fox Circuit have been met with a fixed scale of runs and clearances set by Fox West Coast to which scales they have been obliged to conform.
 
 
 35
 Defendants argue that the implicit finding that the Fox Circuit set a fixed scale of runs and clearances binding upon plaintiff is clearly erroneous, since this scale was set by plaintiff's distributing agent, RKO; that there is no evidence to indicate that plaintiff was adversely affected by any scale of runs and clearances; and that runs and clearances are an economic necessity to which no illegality attaches.
 
 
 36
 Defendants call attention to evidence indicating that plaintiff accepted the system of runs, clearances and availabilities which its distributor, RKO, was using. But the evidence, both written and oral, is in conflict as to whether the system was evolved and controlled by RKO or by National. There was considerable evidence tending to show that National used its market power to promulgate and maintain a uniform system of runs and clearances, particularly in the large metropolitan areas. On the entire record we are not left with a definite and firm conviction that the district court committed a mistake in entering the challenged findings as to runs and clearances. We therefore hold that these findings are not clearly erroneous.
 
 
 37
 In Chorak v. RKO Radio Pictures, Inc., 9 Cir., 196 F.2d 225, 228, we held, in effect, that while runs and clearances are not illegal per se, they are illegal if unreasonable and if imposed as a result of concerted action. We there called attention to suggested criteria for determining the reasonableness of clearances, as referred to in United States v. Paramount Pictures, Inc., 334 U.S. 131, 145-146, 68 S.Ct. 915, 92 L.Ed. 1260, and Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 121, 68 S.Ct. 947, 92 L.Ed. 1245. These criteria call for consideration of such factors as admission prices, character and location of the affected theatres, theatre operating policies, rental terms and license fees, extent of competition, and affiliations.
 
 
 38
 In Paramount, the Supreme Court pointed out that the clearances which were in vogue had acquired a fixed and uniform character and were made applicable to situations "without regard to the special circumstances which are necessary to sustain them as reasonable restraints of trade." Under the district court findings in the Goldwyn case, this same situation was shown to exist, for the court found, on sufficient evidence, that producers of motion pictures when attempting to bargain with the Fox Circuit have been met with a "fixed scale" of clearances and runs.[24]
 
 
 39
 It is this inflexibility, plus imposition by concerted action of the defendants, which gives the district court findings on runs and clearances relevancy in this case. In Paramount, the thrust of such action was by distributors against exhibitors. Here, the thrust of such practice was by a combine of exhibitors, acting in concert with a producer, against independent exhibitors. The result was to weaken the competitive theatre-exhibiting market which plaintiff needed in order to bargain effectively with the Fox Circuit.
 
 
 40
 While there is no explicit finding to this effect, we believe it is implicit when all of the findings are considered together. The findings as to runs and clearances are therefore relevant to the over-all inquiry which was before the court, and tend to show that plaintiff was damaged by antitrust activity on the part of defendants.
 
 
 41
 Circuit buying power. The district court found that: film buying for the entire Fox Circuit was centralized in Los Angeles; Edwin F. Zabel, at various times, negotiated for film for all the divisions of National, and made deals for the entire circuit; the Goldwyn and Metro pictures were bought by Zabel for the circuit; RKO was obliged to accept National's circuit-wide terms; and Fox did business as a theatre circuit in totality, "* * * requiring a producer of films to do business with Fox or lose a fortune."
 
 
 42
 The existence and exercise of this circuit buying power, the district court found, was reflected in the terms which were imposed upon plaintiff and its distributor, RKO. RKO, the court found, could not obtain the terms and conditions from National it requested and received from other exhibitors for the Goldwyn pictures. Among the terms thus denied to RKO on the Goldwyn pictures, were percentage terms, as distinguished from flat rental.
 
 
 43
 As a result of this and other practices, the court found, plaintiff was caused to earn less total rentals than would have been earned in a free competitive market. In the same vein the court found that these and other acts of the defendants had an injurious impact upon plaintiff's motion pictures "* * * in that they depreciated the film rentals that would otherwise have been realized."
 
 
 44
 Defendants contend that most of the findings dealing with circuit buying power are clearly erroneous. They also argue that except to the extent that they deal specifically with transactions between defendants and plaintiff or its distributor, RKO, these findings are irrelevant. Defendants also ask us to differentiate between a mere failure of buyer and seller to agree on terms, and the exertion of an exhibitor's "buying power" to force distributors to deal. In addition, defendants contend that no venal inference arises from the mere size of National, taking the position that size alone without reference to a defined relevant market is entirely meaningless.[25]
 
 
 45
 While the testimony is in dispute concerning the practice of circuit buying, there is ample evidence to support the district court's findings that Edwin F. Zabel, representing National, bought pictures, including plaintiff's, for the entire Fox Circuit. Not all National theatres, however, were included in each transaction, as special circumstances resulted in the exclusion of some National theatres in most cases. For example, in San Francisco, Los Angeles, Denver and Kansas City where both National and RKO had one or more first-run theatres, RKO, as distributor for plaintiff, would usually give the first run of plaintiff's pictures to its own first-run house.[26]
 
 
 46
 But, despite such exceptions, the fact remains that, on the whole, plaintiff sold pictures to National for exhibition in its large circuit, or it did not sell to any National theatres. And when Zabel bought for the "circuit" that included not only theatres owned and operated by National, but also numerous theatres which National controlled or influenced.
 
 
 47
 Contrary to defendant's contention, there was evidence from which it could be inferred that National used its position in closed towns to exert pressure on distributors. At least two witnesses testified, in effect, that it was not possible to negotiate for National's closed towns alone.[27] Where such circumstances exist it may reasonably be inferred that the monopoly power arising from control of closed towns is being used to exact favorable terms in open towns.[28]
 
 
 48
 There was also evidentiary support for the findings concerning percentage terms and flat rentals. According to this evidence, plaintiff was unable to get terms based on a percentage of gross admissions except as to what National designated as "percentage theatres." As to the remaining National theatres, only flat rentals, fixed regardless of performance, were available to plaintiff. But National's version of percentage terms, involving a so-called "sliding scale" was itself unfair to producers, according to evidence which the district court was entitled to believe.[29]
 
 
 49
 With regard to almost every other facet of National's buying practice now under discussion the oral testimony is in dispute and the written evidence is inconclusive. In these circumstances we are unable to hold that the findings entered, as reviewed above, are clearly erroneous.
 
 
 50
 Defendants extensively review the evidence pertaining to the licensing of each of plaintiff's pictures marketed in the 1947 to 1950 period, and conclude therefrom that whether or not there were illegalities which might be complained of in a government case or by other exhibitors, none were practiced upon plaintiff in connection with these seven pictures. They also argue that, in any event, the district court should have made findings with respect to the treatment plaintiff received in the negotiations pertaining to each of these pictures.
 
 
 51
 The evidence was by no means undisputed concerning the negotiations for the licensing of these pictures. But apart from this, the conversational or written give-and-take which comprised the surface negotiations is not necessarily a reliable indication of the real forces at work, or so the district court could find. If National held an overpowering bargaining position by reason of its intercorporate relationships and alliances, to be discussed below, acquiescence by plaintiff or its distributor, RKO, in licensing terms does not manifest fair bargaining in a climate of free competition. If, as the evidence tends to show, National exerted a similar power in connection with its dealings with other producers except Twentieth Century Fox, and with other distributors, the fact that plaintiff fared as well, rental-wise, proves little.
 
 
 52
 Defendants, on the basis of their review of the individual transactions, call attention to the fact that no representative of RKO has ever said that plaintiff was coerced or imposed upon or subjected to any improper pressure in any dealings with National. They point out that RKO, with a twenty per cent interest in the rental of plaintiff's films has never asserted any claim that the rentals paid by National were unfair, discriminatory or inadequate. They note that plaintiff itself, before this litigation, had never asserted that the film rentals paid by National for WALTER MITTY and BISHOP'S WIFE were inadequate, discriminatory or in any way unsatisfactory.
 
 
 53
 There are, of course, factors to be taken into consideration in making the basic findings on this branch of the case, and in testing, on review, the evidentiary support for such findings. But, although persuasive, they are not conclusive. The business relationship between RKO and National during the critical period, and since, may well have been such as to preclude, from a practical standpoint, any indication of dissatisfaction by RKO. Likewise, the very circumstances which, as the district court found, forced plaintiff to deal with National largely on the latter's terms, may have restrained plaintiff from making an issue of the film rentals for WALTER MITTY and BISHOP'S WIFE prior to this litigation.
 
 
 54
 Perhaps the reason why findings were not made as to the negotiations of each picture is because the district court perceived that it was more important to examine the underlying considerations which governed the negotiations than to report what offers and counter offers passed between the parties. The findings which were entered, dealing generally and specifically with the relevant practices and relationships which necessarily set the course for the negotiations, were thorough and complete. If, as we hold, these general findings are not clearly erroneous, the lack of detailed findings concerning the negotiations for each picture does not undermine the integrity of the judgment.
 
 
 55
 We conclude that the findings of fact as to defendants' circuit buying power, and how it was exercised, are sufficient, and are supported by the evidence. Taken in conjunction with all of the other findings of fact, they tend to support the conclusions reached concerning defendants' antitrust activities with regard to plaintiff during the period in question.
 
 
 56
 Allocated or split product. The district court made findings to the effect that National and competing exhibitors entered into arrangements as to the licensing of pictures whereby they "allocated product" or "split product" by agreeing as to what picture each would license.[30]
 
 
 57
 Defendants concede that "there were certain arrangements relating to the negotiations for pictures." But these, defendants assert, were not designed nor did they operate as anti-competitive restraints, being actually designed for the benefit of exhibitors and distributors. The objective, we are told, was to give exhibitors some assurance of a regular supply of product and to give distributors some assurance that outlets would be available to them. No such arrangements were made, defendants contend, unless the distributor or distributors who were involved were parties to it. In any event, defendants urge, no such arrangements had any effect on the licensing of the Goldwyn pictures and no theory of damages was related to these claimed arrangements.
 
 
 58
 There was evidence to the effect that all distributors, including RKO which represented plaintiff, had their regular customers and, to serve their own interests, gave such customers preference in the initial negotiations for their pictures. But the agreements referred to in the findings of fact, were, for the most part, arrangements between exhibitors, under which a given exhibitor was given the first opportunity to negotiate for a picture or pictures. There were, however, no agreements that if the first negotiation failed the other exhibitor or exhibitors were foreclosed from negotiating for the picture. Nor were there any agreements as to prices to be offered or paid, although sometimes the allocation arrangement resulted in the withholding of a bid or the tendering of a fictitious bid by an exhibitor who, under the arrangement with another exhibitor, was not to get that particular picture.
 
 
 59
 It is also true that distributors usually learned, from one source or another, of the various arrangements entered into between exhibitors for the allocation of product. With knowledge of such arrangements they nevertheless often entered into licensing agreements with exhibitors who were parties to such arrangements. But there was also evidence to indicate that distributors usually were not informed of these arrangements by the exhibitors who were parties thereto, and that the distributors were not themselves parties to the allocation arrangements as such.
 
 
 60
 For the purposes of this case, we may assume that the following excerpt from the unreported opinion of Judge Palmieri in United States v. Loew's, 1962 CCH Trade Cases, par. 70,347, called to our attention and relied upon by defendants is a correct statement of the law:
 
 
 61
 "Concededly, any arrangement whereby exhibitors agree with each other that they will not compete in the buying of the product cannot be countenanced; although it is equally clear that splits of product with the consent of both distributors and exhibitors are proper."
 
 
 62
 As indicated above, the evidence in this record indicates that there were many splits of product to which the distributor, and particularly RKO on behalf of plaintiff, had not consented in advance, but which were the result of arrangements between competing exhibitors. The action of a distributor in licensing films to an exhibitor with knowledge, usually from other sources, of the arrangement between exhibitors under which the particular film was allocated to that particular exhibitor, may or may not indicate consent to such an arrangement, depending upon the circumstances of the case.
 
 
 63
 Where, as here, the exhibitor has a dominating bargaining power by reason of its corporate structure and business alliances, such acquiescence, in this case by RKO for plaintiff, is likely to manifest surrender in the face of economic pressure. We are unable to say, on this record, that the district court erred in viewing, in this light, the allocation arrangements affecting plaintiff between the Fox Circuit and competing or allied exhibitors which were in effect during the period in question.
 
 
 64
 At least six of the sixteen specific instances of product arrangements and alliances referred to in the findings of fact involved only years subsequent to the 1947 to 1950 period here in question. As to some of the other specific instances the evidence does not clearly establish that the critical period was involved. As to most of the specific instances, only one or two of the seven pictures in question could have been affected.[31]
 
 
 65
 While these circumstances tend to minimize the adverse impact which this practice could have had upon plaintiff, insofar as recovery of damages in this case is concerned, they do not completely negative such an impact. As in the case of other practices which have been or will be discussed, it was not possible to determine, in dollars, the damages attributable to the practice of allocating and splitting product, and the district court did not attempt to do so. Nevertheless, if the findings that this practice occurred are sustainable, and we hold that they are, and if the conclusion that the practice was illegal under the circumstances is correct, and we hold that it is, such findings and conclusion have relevance as tending to support the holding on liability and the fact, if not the amount, of damages.
 
 
 66
 Competitive bidding. Under a system of competitive bidding, as applied to the motion picture industry, a distributor who has a picture available sends to competing exhibitors an invitation to bid on the picture. If they respond the distributor, in theory, is to accept the best bid. In practice the distributor sometimes rejected all.
 
 
 67
 The practice of competitive bidding is closely related to that of allocating and splitting product. Where the latter practice is followed, there is either no competitive bidding or it is subject to being circumvented by fake bidding or abstention of bidders.
 
 
 68
 The district court found that: the competition engendered by honest competitive bidding resulted in the payment of higher film rentals, and increased playing time, as compared to transactions not involving competitive bidding; competitive bidding for pictures developed at the conclusion of the Paramount case and served as a means of assuring some measure of competition in the industry; during the three years involved in the present case, competitive bidding occurred not only as to plaintiff's pictures in certain instances, but also as to many of the products of defendants and their rivals; National, in concert with other exhibitors, however, restrained and eliminated competition with respect to plaintiff's pictures by agreements to eliminate competitive bidding.
 
 
 69
 Defendants call attention to difficulties and defects in any system of competitive bidding for motion pictures. They cite decisions in which the system has been criticized, including the Paramount case, where a provision of the decree enforcing competitive bidding was disapproved.[32] They call attention to evidence in the record indicating that distributors, including RKO, do not like competitive bidding, and that plaintiff never initiated competitive bidding but was content to follow RKO's policy which was not favorable to competitive bidding.
 
 
 70
 Plaintiff, however, does not contend that competitive bidding is an ideal method of film licensing. It does not appear to rely, in this court, upon the trial court's finding that National agreed with other exhibitors to eliminate competitive bidding, and that this restrained and eliminated competition.[33] Plaintiff finds significance in the competitive bidding evidence in this case only as it assertedly provides a way of measuring plaintiff's damages resulting from other practices followed by defendants.
 
 
 71
 There is, indeed, evidence to indicate that in those instances where National practiced competitive bidding, it paid more for films than when it negotiated for them. In this respect, the evidence as to competitive bidding has probative value here.
 
 
 72
 Relationship to Naify operations. As explained in note 4, the Naify Circuit was comprised of three corporations, i. e., United California, T. & D. Jr., and Golden State. National was a stockholder in both Golden State and T. & D. Jr.[34] The Naify Circuit owned or operated over one hundred theatres in California and Nevada.
 
 
 73
 The district court found that the Naify Circuit used its circuit-buying powers to establish a preferential system of runs, clearances and availabilities on behalf of its forty theatres in San Francisco and the East Bay area, based on admission prices. The district court also found that the Naify Circuit did not license pictures on a theatre-by-theatre basis, but on a circuit basis; on such circuit deals, the Naify Circuit combined closed towns with open towns; and that the Naify Circuit gave Twentieth Century Fox preferential treatment in the booking of pictures. It was found that agreements existed between the Naify Circuit and the Fox Circuit, relating to the maintenance of non-competitive theatre holdings and to the negotiation and licensing of motion pictures.
 
 
 74
 The court also made the following findings of fact concerning the Naify Circuit:
 
 
 75
 "92. From the time the pooling agreements were entered into between the Naify Circuit and the Fox Circuit, the Fox Circuit actively assisted and aided the Naify Circuit in the negotiation and licensing of motion pictures.
 
 
 76
 "93. In 1947 and 1948 conferences were held between the Naify Circuit and the Fox Circuit with respect to the development of a sliding scale based on theatre expenses for use by the Naify Circuit.
 
 
 77
 "94. Joseph Schenck became an intermediary in film licensing negotiations between the Naify Circuit and Loew's, Inc."
 
 
 78
 With regard to these quoted findings, defendants first argue that, as the owner of almost a third interest in the Naify Theatres, National had a natural interest in its investment. They point out, however, that National and Naify had no common directors, officers or agents,[35] and assert that National took no part in the Naify operation or its management. Moreover, defendants insist, National had no part in fixing the terms on which Naify licensed pictures, thus in effect challenging certain of the findings referred to above.
 
 
 79
 There is substantial evidence to support finding of fact No. 93, quoted above. Copies of correspondence were introduced showing that, in 1948 and 1949 there were conferences and exchanges of data pertinent to a sliding scale of expense formula.[36] With regard to findings Nos. 92 and 94, however, plaintiff calls attention to no supporting evidence. Defendants have called attention to what they represent to be the only evidence bearing thereon. All of it, except one item, relates to years other than 1947 to 1950, and the one item which relates to the critical years actually has to do with finding No. 93.
 
 
 80
 The corporate interrelationship between National and the Naify Circuit may of course have antitrust significance apart from particular operating practices of the kind under discussion. This is a matter to be discussed below. Confining ourselves at this point to the three findings of fact which defendants challenge, we hold that No. 93 is supported by the evidence and has relevance to the question of antitrust violations, and that Nos. 92 and 94 are clearly erroneous, insofar as the years 1947 to 1950 are concerned.
 
 
 81
 National's corporate structure and theatre interests. The district court found that in addition to the theatres it owned, National controlled over 150 theatres through various forms of joint operating agreements, joint corporations, pools, and joint ventures. The two largest groups of theatres in which National or a subsidiary was found to hold such a joint interest were the fifty-eight houses operated by United West Coast Theatres Corporation (United West Coast) and the Principal Theatres, Inc. theatres, comprising fourteen houses.
 
 
 82
 The court found that the means utilized in acquiring such control involved the making of commercial alliances with independent exhibitors in National territory "* * * who, but for the alliances would have been formidable competitors in the market for plaintiff's pictures." The court found that the buying of films for all theatres in the various pools in which National had an interest was done entirely by National. An exception to this practice was made in the case of the Naify Circuit, the court found, as the buying of films for the Naify Circuit was done by that circuit, but with the advice and active collaboration of National.[37]
 
 
 83
 The district court found that a basic agreement, first entered into by United Artists and Fox West Coast on September 1, 1933, but further extended to at least December 31, 1959, provided that ten United Artists theatres and approximately twenty-three Fox West Coast Theatres were leased or subleased to United West Coast. United West Coast was owned seventy per cent by Fox West Coast and thirty per cent by United Artists.
 
 
 84
 The court found that, under this agreement, certain other theatres were to be operated by Fox West Coast, the profits and losses to be divided between the parties on the seventy per cent — thirty per cent ratio. The court found that, as a result of the pooling of interests of Fox West Coast and United Artists in United West Coast, "* * * competition both generally and specifically with respect to the licensing of plaintiff's pictures for exhibition, was restrained and eliminated."[38]
 
 
 85
 The court found that, after the formulation of the United West Coast pool under the basic agreement, twenty-three theatres were acquired by Fox West Coast or United Artists, or together, but were not operated by Fox West Coast and United Artists in competition with one another. Instead, the court found, these theatres were added to the United West Coast pooled holdings pursuant to the "no separate acquisition" provision of the basic agreement.
 
 
 86
 According to the district court, the United West Coast pool was not terminated until February 1, 1950. During the time of its existence, the court found, this pool was a restraint upon and worked an elimination of competition between Fox West Coast and United Artists and other exhibitors. The court found that during the period 1947 through 1949, a total of $31,125,433.15 in admissions revenue, or 21.67 per cent of the total Fox West Coast admissions revenue was derived from the operation of the United West Coast Theatres pool. The court expressly found that this pool operated to restrain and eliminate competition among these parties for the licensing of plaintiff's pictures.
 
 
 87
 Findings of the same general character, although not as detailed, were made with regard to the relationship between Fox West Coast, United Artists Theatres, and the Naify Circuit, and Fox West Coast and Principal Theatres, Inc.[39]
 
 
 88
 The district court concluded that defendants' joint operating arrangement with the United Artists Theatre Circuit, their interests in the Naify Circuit, their representation on its board of directors, the elimination of competition between the Naify Circuit and Fox West Coast, and defendants' joint operating arrangements with competitive exhibitors in the Principal Theatres and Hamrick pools, violated section 1 of the Sherman Act. The court further concluded that the combination of the United Artists pool, the Principal pool, the Hamrick pool, the Naify Circuit, and all the other joint operating arrangements and joint interests with competitive exhibitors, taken as a whole, violated sections 1 and 2 of the Sherman Act.
 
 
 89
 With regard to these findings, defendants first object to the use of the term "pools" in referring to jointly-owned corporations. They point out that, as indicated in the Paramount case, 334 U.S. 131, 149, 68 S.Ct. 915, 92 L.Ed. 1260, pooling agreements are those between exhibitors by which their theatres, normally competitive, are operated as a unit, or managed by a joint committee or by one of the exhibitors, the profits from all theatres in the pool being shared according to prearranged percentages. In Paramount, the court distinguished between "pooling agreements," as so defined, and arrangements between exhibitors for joint ownership of theatres.
 
 
 90
 Defendants concede that, prior to June 30, 1947, National had been a party to certain pooling arrangements. They assert, however, that all such pools had been terminated as of that date and therefore could have had no effect upon the Goldwyn pictures here involved.
 
 
 91
 Defendants are correct in drawing the indicated distinction between pooling agreements and other business arrangements involving joint ownership of theatres. However, defendants have not been prejudiced by any characterization of joint ownership agreements as "pooling" arrangements.
 
 
 92
 Although all "pools" in the Paramount sense may have been terminated prior to June 20, 1947, the record discloses that joint ownership arrangements of the kind dealt with in the Paramount case, continued during the damage period. The basic agreement which Fox West Coast and United Artists entered into on September 1, 1933, in which joint ownership arrangements were provided for, was last extended by written agreement dated August 4, 1944. The basic agreement was thereby extended to December 31, 1959. It was actually terminated on December 21, 1949, in fulfillment of a provision of the Paramount decree.
 
 
 93
 National also held partial or controlling interests in other exhibiting corporations outside of the Twentieth Century Fox hierarchy. The two prime examples of this are Principal Theatres, Inc., in which National held a controlling interest, and the Naify Circuit, in which National held a substantial although minority interest.[40] As before indicated, the district court found and concluded that these joint-ownership arrangements violated the Sherman Act.
 
 
 94
 Defendants argue that National's joint ownerships in such corporations during the years in question were not per se illegal. We need not decide whether this is true, because the district court did not hold that such joint ownerships were illegal per se and the plaintiff does not here argue that they were.
 
 
 95
 What the district court held, and what plaintiff here asserts, is that these joint ownerships were illegal under the particular facts of this case. Defendants challenge this holding and make reference to facts of record which, in their view, establish the innocuous character of these joint ownerships, at least insofar as plaintiff is concerned.
 
 
 96
 Our examination of the evidence leads us to conclude that the district court was warranted in concluding that the several joint ownership arrangements involved violations of the Sherman Act. The basis for reaching this conclusion was probably more broadly established with respect to the Principal Theatres and Naify Circuit joint ownerships than with regard to the National-United Artists joint ownership in United West Coast. The latter, however, at the very least gave effect to a meticulous allocation of areas within which the parties agreed not to compete. Such an arrangement is actually illegal per se.[41]
 
 
 97
 The adverse effect which such joint ownerships have upon competition among exhibitors was discussed at length in the Paramount case. 334 U.S. 131, at 149-153, 68 S.Ct. 915, at 925-927, 92 L.Ed. 1260. While the problem was there viewed primarily from the standpoint of the independent exhibitors, the opportunities for restraining competition which such joint ownerships afford were equally adverse to the interests of independent producers. Plaintiff's only hope of maintaining a strong bargaining position with National was to have available a competing market of independent exhibitors. Every alliance which National made with other exhibitors weakened that competing market.
 
 
 98
 We hold that, in the main and to the extent required to support the judgment which was entered, the district court's findings concerning National's corporate structure and theatre interests during the 1947 to 1950 period are not clearly erroneous. The conclusions which the court drew therefrom, to the effect that such structures and interests were violative of sections 1 and 2 of the Sherman Act, accord with our view of the law. The adverse effect thereof upon plaintiff during the critical years was sufficiently established to support the finding that plaintiff had been substantially damaged.
 
 
 99
 * * * * * *
 
 
 100
 In the above review of particular practices, relationships and corporate interests, we have indicated that, in some respects the findings and conclusions of the district court are not sustainable. In the main, however, we had indicated that the findings and conclusions of the district court are supported by the evidence and the law. We therefore hold that the district court did not err in finding and concluding that defendants engaged in proscribed antitrust activities during 1947 to 1950, which resulted in damage to plaintiffs.
 
 Liability — Twentieth Century Fox
 
 101
 Twentieth Century Fox contends that, whatever liability may have been established as to the other defendants, none was established as to Twentieth Century Fox.
 
 
 102
 In support of this view that company argues that all of the findings upon which liability was predicated related to claimed activities or restraints on the part of National only, in the operation of theatres. Twentieth Century Fox further asserts, in effect, that there is no evidence whatsoever which would support a finding of fact that that company, as a producer or distributor of motion pictures, or otherwise, had engaged in any activities which affected the plaintiff in any respect.
 
 
 103
 The practices, relationships and interests which were held to constitute such violations are referred to in paragraphs 2 through 13 of the conclusions of law. The principal violations referred to in these conclusions of law relate to the acquisition of monopoly interest, maintenance of joint interests, the formulation of joint operating arrangements, and participation in various forms of agreements and arrangements between defendants and their competitors.
 
 
 104
 The objective of these various interests, relationships and arrangements was the elimination of competition in the exhibition of motion pictures. This objective was accomplished by concentrating buying power in National, dividing and allocating products, granting the right of first refusal or first right to negotiate for film licensing, fixing clearance schedules, and by various other means.
 
 
 105
 That the district court intended to charge Twentieth Century Fox with many of these violations is demonstrated by the fact that in six of the twelve relevant paragraphs of the conclusions of law, the defendants are referred to collectively, no individual defendant being named (Paragraphs 2, 4-6, 11-12). Three other paragraphs refer to the defendants collectively and also to one or another of the named defendants (Paragraphs 3, 9, 13). It remains to be determined whether the findings of fact support these conclusions of law, insofar as Twentieth Century Fox is concerned.
 
 
 106
 The findings of fact reveal that the specific acquisitions, all of the joint interests and joint operating arrangements, and most of the various forms of collaboration between defendants and competitors, referred to in the conclusions of law, were engaged in by defendants National or one or more of its subsidiary corporations, Twentieth Century Fox not being expressly named as a participating defendant. This is likewise true, with exceptions to be noted, with regard to the specific means employed in achieving the desired objective of restraining competition in the exhibition of motion pictures.
 
 
 107
 But the findings of fact refer to at least two ways in which Twentieth Century Fox participated in some of the specific activities which, the district court held, constituted Sherman Act violations.
 
 
 108
 It was the recipient, and therefore a participant in the practice, of preferential treatment from the Naify Circuit in the booking of pictures. The Naify Circuit gave Twentieth Century Fox the best playing time, including holdings and extended runs (Paragraphs 86, 87). This necessarily prejudiced all other producers whose films were being exhibited by the Naify Circuit.
 
 
 109
 In 1945, and again in 1947, Twentieth Century Fox, through its distribution department, received rebates from National in the amount of $500,000 representing additional film rental on pictures produced by Twentieth Century Fox and exhibited in National theatres. The significance of this incident lies in the fact that although uniform film-rental schedules were purportedly prescribed by National, that company, was in effect, passing along to Twentieth Century Fox some of the profits it realized by imposing low rental rates on competing producers, including plaintiff.
 
 
 110
 These findings are sufficient we believe, to support the district court's conclusion that Twentieth Century Fox is liable to plaintiff for damage proved. They establish that Twentieth Century Fox was a participant in, and a beneficiary of, the combinations, contracts and conspiracies found to exist. It must therefore share responsibility for the resulting damage, including that occasioned by activities in which it did not directly participate, or from which it did not directly benefit.[42]
 
 Damages
 
 111
 The district court found that, by reason of defendants' conduct in violation of sections 1 and 2 of the Sherman Act, plaintiff sustained actual damages in the amount of $100,000 during the period from May 16, 1947 to May 16, 1950.
 
 
 112
 Under their argument as to the amount of damages defendants assert that a study of the revenues received by plaintiff during this period will demonstrate that no damage was sustained, and that the finding of $100,000 actual damages is therefore clearly erroneous. Specifically, defendants urge that an examination of the evidence pertaining to the results from the exhibition of the seven pictures in question shows that National's treatment of plaintiff's pictures compares favorably with its treatment of comparable pictures of other producers. They also insist, on the basis of this evidence, that National's treatment of plaintiff's pictures compares favorably with the treatment accorded them by other exhibitors.[43]
 
 
 113
 On its cross appeal, plaintiff contends that the district court erred in finding that plaintiff's actual damages were only $100,000, asserting that they were not less than $300,000.
 
 
 114
 Plaintiff first argues that defendants' studies covering National's treatment of plaintiff's pictures as compared to its treatment of comparable pictures of other producers is irrelevant, the only question being whether plaintiff received the price it would have obtained in an open and competitive market. Second, plaintiff contends that the conclusion defendants draw that plaintiff received nondiscriminatory treatment from National is undermined by the facts concerning National's rebate to Twentieth Century Fox.
 
 
 115
 Concerning defendants' argument that National's treatment of plaintiff's pictures compares favorably with the treatment accorded them by other exhibitors, plaintiff's challenge is principally on the ground that defendants did not select appropriate non-National exhibitors for comparison and that they utilized improper statistical methods. Taking defendants' data as to film rentals, gross admissions, and the like, and employing what it regards a proper statistical method, plaintiff compares results obtained with its pictures at National, as compared to non-National exhibitors in markets which, according to plaintiff, more nearly resembled competitive markets. Plaintiff presented these materials in the form of six statistical studies. Needless to say, the results were strikingly different from those produced by defendants' studies.[44] Defendants are as critical of plaintiff's studies as plaintiff is of defendants'.
 
 
 116
 On its cross appeal as to damages, plaintiff does not rely on the opinion testimony of its own witnesses. But in answering defendants' contention, on the appeal, that no damage was sustained, plaintiff calls attention to opinion testimony which was received in its behalf. James A. Mulvey, President of Samuel Goldwyn Productions, Inc., and Robert Mochrie, Vice President and General Sales Manager of RKO, both testified as to the impact of defendants' theatre holdings and practices upon plaintiff.
 
 
 117
 Each of them expressed the view that because National bargained on an all-or-none basis, and because it would be financially disastrous should they fail to sell a Goldwyn picture to National, they were obliged to accept film rentals greatly below the levels which would have prevailed in a competitive market. Defendants attack this testimony, and particularly that of Mulvey, most aggressively.[45]
 
 
 118
 In determining the amount of damages the court apparently found strength and weakness in the evidence submitted by both parties. It arrived at a figure for actual damages which was $100,000 more than the zero damages defendants argued for, and $200,000 less than the minimum damages plaintiff believed the evidence would support.
 
 
 119
 The court found that, based upon comparisons derived from defendants' figures, plaintiff received $62,000 less from National for WALTER MITTY than would have been received under similar conditions absent the "illegal monopoly" of National. Plaintiff, the court found, similarly received $29,000 less for ENCHANTMENT than it actually received from non-National exhibitors under similar circumstances, absent monopoly factors. The court found that the foregoing figures are not the complete measure of damages for they do not take into account the increase in playing time, absent monopoly factors. The court found that Mulvey's testimony, to the effect that plaintiff was damaged in the amount of $287,675 as to the five pictures exhibited by National, "is persuasive as a base upon which to predicate a reasonable estimate of damages."
 
 
 120
 None of the studies submitted by either party was so indisputably correct as to warrant a holding on appeal that it is conclusive and controlling as to the amount of damages. Each such study had qualities which gave it probative weight. Each was subject to discount in the light of direct attack or counterbalancing studies. The district court properly appraised these studies in the light of associated testimony and independent opinion evidence. The amount of damages awarded lies within the range of all of the evidence as to damages.
 
 
 121
 Both as to the appeal and the cross appeal, therefore, we hold that the district court did not err in setting actual damages at $100,000.
 
 Statute of Limitations
 
 122
 Which statute of limitations. All that is said above on the question of damages sustained during the years 1947 to 1950, is said on the assumption that the applicable statute of limitations does not preclude recovery for those years.
 
 
 123
 This assumption is well founded if the applicable statute of limitations is Cal. Code Civ.Proc. § 338(1) prescribing a three-year period for the commencement of actions upon a liability created by statute, other than a penalty or forfeiture. This action was commenced on May 16, 1950. The three-year period would accordingly extend from May 16, 1947 to May 16, 1950.
 
 
 124
 Defendants argue, however, that the applicable statute of limitations is Cal. Code Civ.Proc. § 340(1) prescribing a one-year period for the commencement of actions upon a statute for a penalty or a forfeiture, when the action is given to an individual. This statute is applicable, defendants contend, because an action for treble damages under the antitrust laws is an action for a penalty. The limitation of plaintiff's claim to one year would mean, at most, only two of the Goldwyn pictures would be involved.[46]
 
 
 125
 Defendants pleaded both the one- and three-year statutes of limitations as defenses to the action. Thereafter, they moved for a partial summary judgment dismissing all claims, if any, of the plaintiff which accrued prior to May 16, 1947. The district court understood from this motion that defendants were then relying only upon the three-year statute of limitations instead of the one-year statute.[47] This assumption was warranted, since otherwise defendants would have asked for dismissal of any claim which accrued prior to May 16, 1949.
 
 
 126
 When the district court granted partial summary judgment at defendants' request, thereby limiting plaintiff's claims to the 1947 to 1950 period, it was plaintiff, and not defendants, who sought review by way of petition for a writ of mandamus.
 
 
 127
 In a pretrial order thereafter entered, the defendants' statement of trial issues are set forth. No issue concerning the one-year statute of limitations is mentioned in this statement. On the contrary, all issues relating to liability and damages were expressly referenced to the period from May 16, 1947 to May 16, 1950.
 
 
 128
 In proposed findings of fact submitted by defendants at the end of the trial it was stated, among other things, that the defendants "pleaded various affirmative defenses including the defense that any claim for relief accruing prior to May 16, 1947, was barred by limitations. * * *" Defendants' proposed findings with regard to both liability and damages were related to the 1947 to 1950 period, no findings being proposed with regard to the more limited period of 1949 to 1950.
 
 
 129
 Defendants attribute their reliance, in the district court, on the three-year statute of limitations, to the general assumption then prevailing, based on the language used by this court in Steiner v. 20th Century-Fox Film Corp., 9 Cir., 232 F.2d 190, 194 that the three-year statute is the applicable statute. Defendants argue that later court decisions in other circuits, and a district court decision in this circuit,[48] demonstrate that it is the one-year statute which is applicable. In view of these circumstances, defendants assert, they are entitled to take advantage of this new decisional law and now rely on the one-year statute.
 
 
 130
 We do not agree. If defendants had urged such a view in the district court they would be in a position to assert it here, even if it involved an overruling of our decision in Steiner. But having invited the asserted error which they contend results from application of the three-year statute, defendants are not now in court on that issue. The view just stated, which is applicable with regard to appellate adjudication generally, is especially applicable with regard to a defense, such as the statute of limitations, which is waived unless asserted.
 
 
 131
 In order to preserve the point for review defendants were not required to request a finding of fact or conclusion of law dealing with the one-year statute. As defendants point out, Rule 52(a), Federal Rules of Civil Procedure, dispensed with the necessity for such requests in order to preserve a point for review. But defendants were required to adhere to the defense of the one-year statute which they advanced in their answer, so that the court would be obliged to rule thereon. Instead, defendants in effect abandoned that defense, as a result of which there was no ruling upon it. The whole trial was had on the theory, asserted by defendants in their motion for partial summary judgment, that the three-year statute is applicable.
 
 
 132
 Without reaching the question as to which statute is applicable, we hold that, under the circumstances of this case, the district court did not err in applying the three-year statute.
 
 
 133
 Tolling the statute of limitations. On the cross appeal, plaintiff contends that the trial court erred in holding that, as to Twentieth Century Fox and National, the three-year statute of limitations began to run on May 16, 1947. Plaintiff argues that, as to these defendants, the running of that statute of limitations was pursuant to section 5 of the Clayton Act,[49] suspended during the pendency of United States v. Paramount Pictures, Inc., S.D.N.Y., 66 F.Supp. 323, 70 F. Supp. 53, aff'd in part and rev'd in part, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; S.D.N.Y., 85 F.Supp. 881, aff'd per curiam 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380.[50]
 
 
 134
 Section 5 of the Clayton Act is quoted in the margin.[51] The Paramount case, in which Twentieth Century Fox and National were defendants, was pending as to them from the time the complaint was filed therein on July 20, 1938, until the decree therein became final as to Twentieth Century Fox and National on October 16, 1950.[52] The action now before us was commenced on May 16, 1950, while the Paramount case was still pending. Thus, if plaintiff is correct in his contention, the claim should not have been cut off as to Twentieth Century Fox and National on May 16, 1947, but as of July 20, 1935.[53]
 
 
 135
 Section 5 (now section 5[b]), specified circumstances under which the running of the statute of limitations in respect to private rights of action arising under the antitrust laws was suspended during the pendency of a prior Government antitrust proceeding. According to its terms, the tolling provisions of that statute apply where it appears that: (1) the United States instituted a civil or criminal proceeding to prevent, restrain or punish violations of any of the antitrust laws, and (2) the person claiming the benefit of the statute has a private right of action arising under the same laws and "based in whole or in part on any matter complained of" in the Government proceeding.
 
 
 136
 It is not here disputed that the first of these conditions was met. The Paramount case was a civil proceeding instituted by the United States to prevent or restrain violations of sections 1 and 2 of the Sherman Anti-Trust Act. The district court did not hold otherwise.
 
 
 137
 That court, however, held that plaintiff's right of action, while arising under the antitrust laws, is not "based in whole or in part on any matter complained of" in the Paramount case, and that therefore the second condition specified in section 5, as enumerated above, was not met.
 
 
 138
 In reaching this conclusion the district court decided, from a comparison of the complaints in the two cases that there had been a failure to meet the below-quoted test for determining whether this condition of section 5 had been met, as stated in Steiner v. 20th Century-Fox Film Corp., 9 Cir., 232 F.2d 190, 196:
 
 
 139
 "The same means must be used to achieve the same objectives of the same conspiracies by the same defendants."
 
 
 140
 Plaintiff argues that the district court erred in concluding that the quoted Steiner test was not met. Plaintiff contends that the Goldwyn action is based in part on one or more of the same conspiracies, combinations, contracts or monopolies, having the same objectives, utilizing the same means, and involving the same defendants complained of in Paramount.
 
 
 141
 As one example of a combination complained of in Paramount, which is contended to be similar to one on which the Goldwyn action is based, and which has the same objectives, employs the same means, and involves the same defendants, plaintiff refers to one of the alleged combinations and monopolies referred to in paragraph 170, and succeeding paragraphs, of the amended Paramount complaint.
 
 
 142
 In paragraph 170 it is alleged, among other things, that the parent and subsidiary corporations which form "Fox," constitute a combination and monopoly in restraint of trade, which in and of itself had violated sections 1 and 2 of the Sherman Act. One of the objectives of this combination and monopoly, according to paragraph 174 of that pleading, is to monopolize the business of exhibiting motion pictures in areas serving a substantial percentage of the total population of the United States.[54] According to the same paragraph, the means utilized to achieve that objective was, and is, to acquire and maintain a monopoly of such business in the described areas.
 
 
 143
 According to paragraph 7(a) of that amended complaint, Twentieth Century Fox is engaged in the business of producing, distributing and exhibiting motion pictures, either directly or through subsidiary or associated companies. National was the only subsidiary named in that pleading (paragraph 7(b)), it being alleged that National is a holding company for the theatre interests of Twentieth Century Fox. It follows that Twentieth Century Fox and National, both of whom were named defendants in Paramount, were at least part of the combination and monopoly referred to in paragraphs 170 and 174 referred to above.
 
 
 144
 It remains to be determined whether the Goldwyn action is based, at least in part, on that alleged combination and monopoly, having the objectives there alleged, utilizing the means there referred to, and directed against the same defendants.
 
 
 145
 In paragraph 16 of the Goldwyn complaint it is alleged that the defendants, and others acting in concert with them, have violated and are now violating sections 1 and 2 of the Sherman Act by unlawfully combining to restrain trade and commerce, and by monopolizing such trade and commerce. One of the objectives of this combination and monopoly, according to paragraphs 16(a), 17(a) and 18(a) of the Goldwyn complaint, is to monopolize the business of exhibiting motion pictures.[55] According to the same paragraphs, the means utilized to achieve that objective included the acquisition and maintenance of a monopolistic combine of theatres for the exhibition of motion pictures. Twentieth Century Fox and National, being named defendants in the Goldwyn complaint, were alleged participants in the alleged combination and monopoly referred to above.
 
 
 146
 Comparing the described combinations and monopolies with their respective objectives, means of accomplishment and participants, as set forth in the amended Paramount complaint, and in the Goldwyn case, it would seem that all of the similarities are present which are required to meet the Steiner test. But defendants argue that the Goldwyn action is not based in part on this particular combination and monopoly alleged in the Paramount case, because, in that case the Government did not allege that the monopoly there charged operated to prevent non-theatre-owning producers from licensing their pictures to theatres of producer-exhibitors on fair and reasonable terms. To the contrary, defendants assert, Goldwyn was there charged with being one of those who fostered the monopoly complained of.
 
 
 147
 We take it that defendants do not mean to question the sufficiency of these allegations in the amended Paramount complaint to state a claim. It was not necessary, to state such a claim, that the Government allege that the participants had a specific intent to exclude, or admit on their terms, Goldwyn or others in his position from the theatres which they controlled.
 
 
 148
 As stated in United States v. Paramount Pictures, Inc., 334 U.S. 131, 173, 68 S.Ct. 915, 936-937, 92 L. Ed. 1260, a "specific intent" is not necessary to establish a "purpose or intent" to create a monopoly, but that the requisite "purpose or intent" is present "* * * if monopoly results as a necessary consequence of what was done." Nor was it necessary for the Government to allege that the alleged monopoly power created by the vertical integration in question had actually been exercised.[56]
 
 
 149
 But what defendants are saying is that, even though these allegations be sufficient to state an actionable combination or monopoly, since it was not alleged that the combination or monopoly there charged operated to prevent non-theatre-owning producers such as plaintiff from licensing their pictures to the theatres controlled by the vertical integration on fair and reasonable terms, that combination and monopoly falls short of, or differs from, the combination and monopoly on which the Goldwyn action is based.
 
 
 150
 Monopoly power carries with it the power to exclude competition wholly, or to permit competition on terms dictated by the monopoly. In Paramount, 334 U.S. at page 170, 68 S.Ct. at 935, 92 L.Ed. 1260, the Supreme Court stated that a conspiracy to monopolize the business of exhibiting motion pictures, and such fruits of the monopoly as "price," "clearance" and "run" control, are "interdependent." There is, we believe, a like interdependence between the power and purpose to monopolize the exhibition of motion pictures, and control over the terms on which a competing producer will be permitted to exhibit at such theatres. As we view it, the combination and monopoly, allegedly resulting from the vertical integration of Twentieth Century Fox and its subsidiaries was, in essence, the same monopoly and combination described in the Goldwyn complaint.
 
 
 151
 But, in any event, the tolling statute does not require, and the Steiner test does not provide, that all matters complained of in the private action must find a counterpart in the Government action. The private action is only required to be based in part on a matter complained of in the Government suit. The Goldwyn action is based at least in part on an alleged combination and monopoly between Twentieth Century Fox and National having the objective of monopolizing the business of exhibiting motion pictures, such objective being attained by the acquisition and operation of moving picture theatres.
 
 
 152
 Building on this foundation, plaintiff alleges that this combination and conspiracy has prevented it, as a non-theatre-owning producer, from licensing its pictures to those theatres on fair and reasonable terms. The foundation allegations, which are a substantial and critical part of the Goldwyn case, as so analyzed, related to a combination and monopoly which, in our view, finds substantial similarity in that part of the amended Paramount complaint to which reference has been made.
 
 
 153
 Up to now, our discussion of this point has been predicated upon an analysis of the amended complaint in Paramount. In the original complaint, filed more than two years earlier, the allegations concerning such a combination and monopoly between Twentieth Century Fox and its subsidiaries are perhaps not as precise. Nevertheless we find therein the essential allegations relating to that combination and monopoly, such that it cannot be said that this matter was complained of for the first time in the amended complaint.[57]
 
 
 154
 We conclude that the similarity between the combination and monopoly discussed above, as charged in the original and amended complaints in Paramount, and as charged in the Goldwyn complaint, is such that the Steiner test has been fully met.[58]
 
 
 155
 We are not certain whether it was in applying the Steiner test, or in advancing what may have been regarded as a separate reason for holding that plaintiff is not entitled to the benefit of the tolling statute, that the statement was made by the district court that plaintiff was not within the "target area" of the Paramount case. The "target area" phrase, as the district court indicated, came from the decision of this court in Karseal Corp. v. Richfield Oil Corp., 9 Cir., 221 F.2d 358, 362.
 
 
 156
 Karseal was not concerned with the question before us as to the application of the tolling statute, but with the wholly different question of whether the complaint in that case stated a claim under the antitrust laws. A private antitrust suit by Karseal Corporation, a manufacturer of an automobile polish, had been dismissed on the ground that an alleged restraint of trade as to the sale of accessories, exercised by Richfield Oil Corporation upon service stations was not, under the pleadings, a proximate cause of the damage the manufacturer claimed to have suffered.
 
 
 157
 In reversing, this court held that, contrary to the view of the district court, the manufacturer was within the "target area" of the alleged restraint, and therefore had stated an actionable claim. Discussing what it meant by "target area," this court, in Karseal, referred to it as a factor in determining whether there was proximate causation. At two places in that opinion, there is language indicating that one was not in the "target area" unless he was "aimed at" by the conspirators.
 
 
 158
 But in using the words "aimed at" this court did not mean to imply that it must have been a purpose of the conspirators to injure the particular individual claiming damages. Rather, it was intended to express the view that the plaintiff must show that, whether or not then known to the conspirators, plaintiff's affected operation was actually in the area which it could reasonably be foreseen would be affected by the conspiracy. This is made clear by our quotation, in Karseal, of this excerpt from the opinion in Conference of Studio Unions v. Loew's Inc., 9 Cir., 193 F.2d 51, 54-55:
 
 
 159
 "A conspiracy may have many purposes and objects; the conspirators may perform an almost infinite variety of acts in furtherance of the conspiracy; but, in order to state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured `by reason' of anything forbidden in the anti-trust laws."
 
 
 160
 Assuming, but not deciding, that this "target area" concept is relevant in determining whether the plaintiff in a private antitrust suit may claim the benefit of section 5 of the Clayton Act, plaintiff was within that area under the allegations of his complaint. As one which desired to exhibit motion pictures which it produced, plaintiff was within the area of the economy which was endangered by the alleged combination and monopoly with regard to the exhibition of moving pictures.
 
 
 161
 We conclude that the district court, in the 1956 ruling which Judge Harris was required to follow when the case was later assigned to him, erred in holding the tolling statute inapplicable as to all defendants. In our opinion, it was applicable as to defendants Twentieth Century Fox and National and, as to them, plaintiff should not have been limited to claims arising on and after May 16, 1947.
 
 Attorneys' Fees
 
 162
 Having rendered a judgment for damages in favor of plaintiff, it was the duty of the district court to allow plaintiff a reasonable attorneys' fee. See section 4 of the Clayton Act, 38 Stat. 731, 15 U.S. C. § 15 (1958). That court fixed plaintiff's attorneys' fees in the amount of $100,000, this being also the amount of the award of actual damages.
 
 
 163
 We have heretofore, in this opinion, considered and disposed of all of defendants' points on appeal except those relating to attorneys' fees and other court costs. Accordingly, the award of $100,000 actual damages, tripled to $300,000 has been sustained, and plaintiff's right to attorneys' fees has been confirmed. Defendants, however, contend that the allowance of $100,000 attorneys' fees is excessive, and that no more than $25,000 should have been awarded.
 
 
 164
 The amount of attorneys' fees to be allowed in connection with an award of damages in an antitrust suit is within the discretion of the trial court, reasonably exercised, and will not be disturbed absent an abuse of discretion. Montague & Co. v. Lowry, 193 U.S. 38, 48, 24 S.Ct. 307, 48 L.Ed. 608. We may, however, have somewhat more latitude in determining whether there has been an abuse of discretion than would be true in the usual case, since the judge who fixed the fee came into the case after most of the legal services had been rendered. See Monaghan v. Hill, 9 Cir., 140 F.2d 31, 34.
 
 
 165
 In Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, E.D.Pa., 166 F.Supp. 163, 168-169, aff'd, 3 Cir., 273 F.2d 218, rev'd on other grounds, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, there are listed some of the factors which have been considered by the courts in making an award of a reasonable attorneys' fee in an antitrust suit, or in reviewing such an award on appeal. As there listed, these factors include: (1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government, (2) the standing of counsel at the bar — both counsel receiving the award and opposing counsel, (3) time and labor spent, (4) magnitude and complexity of the litigation, (5) responsibility undertaken, (6) the amount recovered, (7) the knowledge the court has of the conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiffs prior to trial, (8) what it would be reasonable for counsel to charge a victorious plaintiff, and (9) what contribution shall be made by the defendant toward the fees of plaintiff's counsel.
 
 
 166
 While all or most of these factors are useful as guides in fixing such fees, they provide nothing approaching a precise yardstick. In the long run, the weight to be accorded these and other factors in fixing the fees in a particular case must rest largely upon the good judgment of the district court.
 
 
 167
 Such fees are usually fixed at a level substantially below the amount of actual damages awarded. There are, however, cases in which the fee exceeded, or very nearly equaled the damage award.[59] There is no doubt that counsel for plaintiff did a prodigious amount of work in preparing this case for trial, and in trying it.[60] Defendants do not contend to the contrary. They do question the necessity for much of this work. However, this is almost like saying that plaintiff could have won more easily — a not very telling argument when made by those who contend that plaintiff should not have won at all.
 
 
 168
 The lawsuit was most vigorously contested from beginning to end. Numerous complex legal and factual issues were involved. The principles established and elements of proof developed have significance beyond the amount of the damage award. They are, to a considerable extent, pertinent to plaintiff's further proceedings against Twentieth Century Fox and National, authorized herein, in prosecution of the claim for damages covering the years 1935 to 1947.
 
 
 169
 We conclude that, under all of the circumstances of this case, the award of attorneys' fees in the sum of $100,000 does not manifest an abuse of discretion. Should plaintiff recover additional damages in the further proceedings to be had herein, the district court will undoubtedly take into consideration, in allowing further attorneys' fees, the size of the allowance already made and the extent to which services already rendered are utilized in the further proceedings.
 
 
 170
 Plaintiff asks for an award of reasonable attorneys' fees on this appeal in the event of affirmance. Defendants do not oppose this request.
 
 
 171
 We find and determine that $5,000 is a reasonable sum to be awarded plaintiff for attorneys' fees on this appeal. That sum shall be included and taxed as part of the costs in this court.[61]
 
 Assessment of Costs
 
 172
 After entry of judgment but before the appeal and cross appeal were taken, plaintiff claimed costs in the sum of $154,080.12. Defendant filed objections to the cost bill as a whole, and as to individual items comprising a major part of the claimed costs. The clerk of the district court allowed costs in the amount of $5,955.15.
 
 
 173
 Plaintiff initiated proceedings in the district court to review the clerk's action. These proceedings were pending when the main appeal and the cross appeal were taken. Thereafter, the district court taxed costs at $66,507.31. Defendants thereupon appealed from this order.
 
 
 174
 Defendants argue that the major amount of the costs, as fixed by the district court, relate to expenditures which are not recoverable as "costs," and which are not of a kind which the district court could, in its discretion allow. Before we can reach this argument, however, we must deal with plaintiff's intimation that the order of the district court taxing costs may not be appealable.[62]
 
 
 175
 The rule which plaintiff seeks to invoke is that a judgment for costs only is not appealable except as to the issue of the power of the court to assess costs.[63] Since defendants here question only the power of the court to allow certain items of costs, and not the court's discretion in fixing the amount of allowable costs, this appeal from the order fixing costs falls within the exception to the rule on which plaintiff relies. Moreover, this appeal from the order fixing costs is so related to the general judgment on appeal which was then pending, that it should be considered an inseparable part thereof, and not an appeal from an order for costs only in the usual sense.
 
 
 176
 We hold that the order in question is appealable.
 
 
 177
 Plaintiff claimed accounting fees in the sum of $117,781.58, made up of the items listed in the margin.[64] Defendants made several specific objections to these claimed accounting fees. The district court disallowed the $71,850. item representing the accounting fees of Joseph A. Walsh, and allowed the remaining accounting items in the total amount of $45,931.58.
 
 
 178
 Defendants argue that accounting fees are not allowable "costs" within the meaning of Rule 54(d), Federal Rules of Civil Procedure.[65] Union Carbide & Carbon Corp. v. Niseley, 10 Cir., 300 F.2d 561, 586, so holds.[66]
 
 
 179
 But plaintiff calls attention to the fact that, in providing for this item of recovery, section 4 of the Clayton Act, 15 U.S.C. § 15, uses the words: "* * * the cost of suit, including a reasonable attorney's fee," (emphasis supplied), while Rule 54(d) refers to "costs." Plaintiff also makes reference to the legislative history of section 7 of the Sherman Act, 26 Stat. 209 (1890), which was the forerunner of section 4 of the Clayton Act, and other materials. Based thereon, plaintiff argues that, in private antitrust actions a prevailing plaintiff is not limited to costs as contemplated by Rule 54(d) and 28 U.S.C. § 1920, but is entitled to "costs as between solicitor and client" in all such actions.
 
 
 180
 This same contention, in substance, was rejected in Straus v. Victor Talking Mach. Co., 2 Cir., 297 F. 791, 806. In the more recent case of Brookside Theatre Corp. v. Twentieth Century Fox Film Corp., W.D.Mo., 11 F.R.D. 259, 265, modified (by reducing the attorneys' fees allowed), in 8 Cir., 194 F.2d 846, 858, it was held that there are no special or peculiar rules for antitrust actions and "the amounts allowed as costs of suit should reasonably conform to what is commonly understood to be the `cost of suit.'" The Union Carbide case, referred to above, reached the same result.
 
 
 181
 Plaintiff further argues that this court has heretofore sanctioned the awarding of costs to cover accounting fees, citing Monaghan v. Hill, 9 Cir., 140 F.2d 31, 34-35.
 
 
 182
 Monaghan was not an antitrust suit, but was a class suit in which a fund had been created for the benefit of a class. The court held that the expenses of creating the fund, including accounting fees, were payable out of the funds recovered for the members of the class who accept the benefits. The expenses allowed were not an additional amount assessed against the defendant.[67]
 
 
 183
 We hold that the only costs recoverable by a successful plaintiff in a private antitrust suit are those which are normally allowable under 28 U.S.C. § 1920 and Rule 54(d), and that such costs do not include accounting fees. The allowance herein of $45,931.58 for accounting fees was improper and is set aside.[68]
 
 
 184
 Defendants object, on various grounds, to the allowance of costs for the expense of reproducing documents by photostating or otherwise, the expense of a second copy of the transcript of the trial for the use of plaintiff's counsel, the expense of transcribing arguments, pretrial proceedings and the like, witness fees in one instance, and an item for "expressage for Exhibits and Documents," allowed in the sum of $479.
 
 
 185
 We think that the allowance of the expense for "expressage" as costs was improper. The other items referred to above, were allowable and, under the circumstances of this case, the amounts allowed do not manifest an abuse of discretion.
 
 
 186
 Admissibility of Findings and Conclusions Made and Sustained in the Paramount Case
 
 
 187
 We have now disposed of all questions raised on defendants' appeal, and two of the three questions raised on the cross appeal. The final question presented on the cross appeal relates to the ruling of Judge Murphy excluding from the evidence received at the trial certain findings of fact and conclusions of law entered in United States v. Paramount Pictures, Inc., S.D.N.Y., 70 F.Supp. 53, and thereafter sustained by the Supreme Court, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380.
 
 
 188
 In paragraphs 20 to 23 of the complaint herein, certain facts were alleged concerning the Paramount case. These allegations were intended to provide a foundation in the pleadings for the introduction in evidence, as against Twentieth Century Fox and National who were defendants in Paramount, of certain of the findings of fact and conclusions of law entered in that case. In following this course plaintiff sought to take advantage of the first paragraph of section 5 of the Clayton Act, 38 Stat. 731 (1914).[69]
 
 
 189
 On September 15, 1950, and before any answer was filed, defendants filed a notice of motion "to strike and/or for a more definite statement." This motion was directed exclusively to paragraphs 20 to 23 of the complaint, referred to above. It was asserted, in effect, that under the facts alleged in the complaint, and upon a proper construction of section 5 of the Clayton Act, the final judgment or decree rendered in the Paramount case does not, as contended for by plaintiff, constitute prima facie evidence against defendants on the question of violation of the antitrust laws.
 
 
 190
 This motion was heard on September 25, 1950 by The Honorable Michael J. Roche, who was then sitting as presiding judge in the master calendar department of the district court. On October 9, 1950, Judge Roche denied the motion "at this time."
 
 
 191
 On June 14, 1956 plaintiff served on the Fox defendants, and filed, a motion for a pretrial conference, one purpose being to obtain a ruling as to the admissibility, as against Twentieth Century Fox and National, of the judgments, findings of fact and decrees in the Paramount case. This motion was argued before Judge Murphy who, on October 3, 1956, entered an order holding that the judgments, findings of fact and decrees in the Paramount case were inadmissible in evidence in this case.[70] During the course of the trial before Judge Murphy, the Paramount judgments, decrees, findings and conclusions were offered in evidence by plaintiff, but were rejected on the basis of the court's prior ruling.
 
 
 192
 Without the benefit of these Paramount documents, plaintiff has nevertheless established liability as to all defendants covering the years 1947 to 1950. It follows that the exclusion from the evidence of the Paramount findings and conclusions has not prejudiced plaintiff as to those years. But we have held that plaintiff is entitled to proceed with its claims against Twentieth Century Fox and National for the years 1935 to 1947. It is therefore appropriate to decide now, for the guidance of the district court in the further proceedings, whether the Paramount findings and conclusions are admissible as against those defendants in the further proceedings.
 
 
 193
 Section 5 (now section 5[a]), states a rule of evidence with respect to final antitrust judgments or decrees in favor of the United States. It provides, with exceptions not here material, that in a subsequent private antitrust suit, any such final judgment or decree shall be admissible as evidence, and constitute prima facie proof against the defendant, "* * * as to all matters respecting which said judgment or decree would be an estoppel as between the parties. * * *" to the predecessor Government antitrust suit.
 
 
 194
 The "matters" referred to in this statute are the direct determinations of fact and law against the defendant in the prior suit on questions there distinctly put in issue. See Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 569, 71 S.Ct. 408, 95 L.Ed. 534. If any such determinations, considered as evidence, would be relevant with regard to any issue of fact and law in a subsequent treble-damage action involving the same defendant, they are admissible, under section 5, as prima facie evidence of the fact or law so determined.
 
 
 195
 In Emich, the prior Government action had been tried before a jury, which returned a general verdict. As the court stated in that case, a general verdict of the jury or judgment of the court without special findings does not indicate which of the means charged in the indictment were found to have been used in effectuating the conspiracy. Thus the only matter concerning which the judgment in that Government case could be regarded as prima facie evidence, was the general conspiracy for the purpose of monopolizing the financing of General Motors, and its effectuation by coercing General Motors dealers to use GMAC.
 
 
 196
 But the Paramount case was tried to the court without a jury and detailed findings of fact and conclusions of law were made and obtained finality when thereafter sustained on appeal. As to each of these findings of fact and conclusions of law, Twentieth Century Fox and National would be estopped in any subsequent action against them by the Government. Plaintiff was accordingly entitled, under section 5, to introduce in evidence any of the Paramount findings and conclusions which were adverse to Twentieth Century Fox or National, and which are relevant to any of the issues in the Goldwyn case, as prima facie evidence supporting plaintiff's position on those issues.[71]
 
 
 197
 In plaintiff's opening and reply briefs on the cross appeal there are set forth a number of findings of fact and conclusions of law entered and sustained in the Paramount case which, plaintiff contends, are adverse to Twentieth Century Fox or National and relevant to issues of fact or law involved in the Goldwyn case. Defendants have not, in their brief, discussed these particular Paramount findings or conclusions, or their relevancy to the issues of the Goldwyn case. They have, instead, directed their argument mainly to the broad question of the proper construction of section 5, an argument rejected by what we have already said.
 
 
 198
 Because there has thus been no meeting of arguments on the question of what Paramount findings and conclusions, sustained on that appeal, are adverse to Twentieth Century Fox or National, and which of these adverse findings and conclusions, if any, are relevant to any issue in the Goldwyn case, we will not attempt to decide these matters on this appeal. In the further proceedings to be had against these two defendants, the district court will be able to deal with this problem in keeping with the principles stated in this opinion. It need only be added that, in our view, the fact that at an early stage of the Paramount case, Samuel Goldwyn, as an individual, was named as a defendant and co-conspirator, has nothing whatever to do with the applicability of section 5 in the Goldwyn case.
 
 
 199
 * * * * * *
 
 
 200
 As to Fox West Coast Theatres Corporation and Fox West Coast Agency Corporation, the judgment is affirmed on the appeal and the cross appeal, except that the allowance of accounting fees and express charges as court costs is set aside.
 
 
 201
 As to Twentieth Century Fox and National, the judgment insofar as it adjudicates claims for the period from May 16, 1947 to May 16, 1950, is affirmed on the appeal and cross appeal, with the same exceptions as to accounting and express fees, and shall be regarded as a partial judgment. Insofar as the judgment dismisses claims for the period prior to May 16, 1947, the judgment as to Twentieth Century Fox and National is reversed on the cross appeal and the cause is remanded for further proceedings consistent with this opinion.
 
 
 202
 Plaintiff will recover ninety per cent of its cost in this court together with an attorneys' fee in the sum of $5,000.
 
 
 
 Notes:
 
 
 [1]
 26 Stat. 209 (1890), as amended, 50 Stat. 603 (1937), 15 U.S.C. §§ 1, 2 (1958)
 
 
 [2]
 38 Stat. 731, 737 (1914), 15 U.S.C. §§ 15, 26 (1958)
 
 
 [3]
 Prior to entry of the final judgment on September 20, 1961, Samuel Goldwyn, Francis Howard Goldwyn, Samuel Goldwyn, Jr., James A. Mulvey and Ben Fish, doing business as Samuel Goldwyn Productions, a limited partnership, succeeded to the interests of Samuel Goldwyn Productions, Inc. Accordingly, on August 8, 1961, plaintiff moved for a substitution of parties plaintiff to take account of this succession of interests. Such an order was entered on October 13, 1961, nunc pro tunc as of September 20, 1961
 
 
 [4]
 The corporate defendants which were granted a separate trial are United California Theatres, Inc. (United California), and T. & D. Jr. Enterprises, Inc. (T. & D. Jr.) comprising the so-called "McNeil-Naify defendants," Golden State Thetre & Realty Corporation (Golden State), San Francisco Theatres, Inc., and Excelsior Amusement Co., Inc. The McNeil-Naify defendants and Golden State operated the "Naify Circuit." The individual defendants who were granted a separate trial are Michael A. Naify and R. A. McNeil (now deceased), owners and general managers of the Naify Circuit
 
 
 [5]
 All of the stock of Fox West Coast Agency is owned by Fox West Coast. All of the stock of Fox West Coast is owned by National. Prior to May 11, 1943, forty-two per cent of the stock of National was owned by Twentieth Century Fox. After that date, the latter company owned all of the stock of National
 
 
 [6]
 While the trade refers to the "buying" and "selling" of film, the transactions are actually licensing arrangements since the films are copyrighted
 
 
 [7]
 "a. Agreeing to acquire and maintain and acquiring and maintaining a monopolistic combine of first and subsequent run theatres for the exhibition of motion pictures;
 "b. Agreeing to eliminate and eliminating competition in the purchase of film licenses;
 "c. Agreeing to control and restrain, and controlling and restraining negotiations for the terms and conditions for licensing the exhibition of motion pictures.
 "d. Agreeing to allocate and allocating motion picture product among themselves on a non-competitive basis.
 "e. Agreeing to operate and maintain, and operating and maintaining, a rigid uniform and non-competitive system in the booking and playing of motion pictures; and
 "f. Agreeing to establish, fix, decrease, stabilize and depreciate, and actually establishing, fixing, decreasing, stabilizing and depreciating the film rental to be paid producers for the exhibition of motion pictures."
 
 
 [8]
 The action was commenced before the enactment of 69 Stat. 283 (1955), adding section 4B to the Clayton Act, 15 U.S.C. § 15b (1958), which new section provides, among other things, a four-year statute of limitations for causes of action under section 4 of the Clayton Act. Section 4B also provides that no cause of action barred under then-existing law shall be revived by the 1955 enactment. The three-year California statute of limitations relied upon by defendants in moving for partial summary judgment, is Cal.Cod. Civ.Proc. § 338(1)
 
 
 [9]
 Plaintiff applied to this court for leave to file a petition for writ of mandamus or prohibition to review the order of October 3, 1956. On April 11, 1957, we denied the application, our order being unreported
 
 
 [10]
 Through its predecessors, Twentieth Century Fox began acquiring theatres in 1925. In that year it acquired approximately one-third of the common stock of West Coast Theatres, Inc. In March, 1928, it acquired all of the stock of Wesco Corporation which later became National. The latter corporation then owned the stock of various other theatre-operating companies
 
 
 [11]
 National had interests either directly through wholly or partially owned subsidiaries or indirectly by virtue of film buying and other arrangements, in 587 theatres which it operated at the end of 1946, and 531 theatres which it operated in September, 1950. These theatres were located in 189 communities in eighteen states. In addition, National held interests in first run theatres in New York City, Detroit and Philadelphia
 
 
 [12]
 Principal among these were the Naify Circuit, referred to in note 4, comprised of over one hundred theatres during the 1947 to 1950 period; United Artists Theatres of California, Inc.; Principal Theatres, Inc.; Evergreen State Amusement corporation; John Hamrick Theatres; Cascade Theatre Corporation; J. J. Parker Theatres; and the Danz Circuit
 
 
 [13]
 The court found that the buying of films for all theatres in the various groupings in which National had an interest was done entirely by National, except that the buying of films for the Naify Circuit was done by the Naify buying organization with the advice and active collaboration of National, a major stockholder in the Naify Circuit
 
 
 [14]
 In this connection the district court found (findings of fact Nos. 35 and 36):
 "35. National agreed with the different distributors on specific brackets of classification for the distributor's pictures, such as A, Double A, B, C, etc., and for each theatre in the circuit there was a price and playing time designated for each bracket. The negotiation between the National buyer and distributor's representative was merely as to what bracket the picture in question fell into. When this was negotiated out and agreed upon, the terms to be paid by National were automatically determined by the bracket into which it fell. These picture classifications were in effect during the period 1947 to 1950 and had been used at least since 1940.
 "36. The policies and details of operations of each of the divisions were controlled and minutely supervised by National either directly or through the medium of National Theatres Amusement, Inc. Such supervision, control and necessity for final approval by National covered such varied matters as the making of pooling agreements by Fox West Coast for the operation of the theatres in downtown San Francisco and extension of the United West Coast-Fox West Coast-United Artists Theatres agreement to approving expenditure for a new theatre `provided the negotiations with the landlord for the commercialization of the Strand Theatres [sic] (an old theatre which was becoming obsolete) immediately upon the opening of the new theatre are brought to a successful conclusion' and such matters as authorizing the expenditure of $1224 for a new roof on a theatre."
 
 
 [15]
 A subsequent appeal was taken by defendants from the district court order taxing costs and is also before us at this time
 
 
 [16]
 A "circuit key deal" is one under which the exhibitor agrees to pay as film rental a percentage of the film rental the picture earned nationwide, within an agreed period of time,i. e., if he agreed to pay seven per cent this was calculated by treating all other domestic film rental paid as ninety-three per cent. A "lump sum deal" is one involving a single dollar amount for licensing to a theatre circuit without agreement as to the film rental to be paid by any single or group of theatres.
 
 
 [17]
 Such a town is known in the trade as a "closed" town. National theatres were located in approximately 189 communities in eighteen states. Approximately sixty of these communities were "closed" towns
 
 
 [18]
 In Paramount, the court referred to United States v. Griffith, 334 U.S. 100, 107-108, 68 S.Ct. 941, 92 L.Ed. 1236, and Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 115-116, 68 S.Ct. 947, 92 L.Ed. 1245, for a further explanation of this view
 
 
 [19]
 As the Supreme Court said in United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941, 946, 92 L.Ed. 1236:
 "When the buying power of the entire circuit is used to negotiate films for his competitive as well as his closed towns, he is using monopoly power to expand his empire."
 
 
 [20]
 James A. Mulvey, President of Samuel Goldwyn Productions, Inc., testified:
 "* * * in the instance of MY FOOLISH HEART and ROSEANNA McCOY, we had offered the picture to the opposition to Fox, particularly since we couldn't sell the Fox Circuit, and we had difficulties in selling those pictures to the Fox opposition because, as I believed then and now, of arrangements as between Fox and the independent, or the influence of Fox with the independent, and we were never able to sell that picture back to Fox in many of those situations. * * *"
 
 
 [21]
 Peter Lundgren, film buyer and head of the film statistical department of Fox West Coast, discussing the negotiations for the licensing of WALTER MITTY, testified:
 "Q. In connection with that negotiation did you offer to negotiate your closed towns separately?
 "A. No, sir.
 "Q. From your open towns?
 "A. No, sir.
 "Q. They were negotiated together?
 "A. They were part of the complete negotiation; we never separated one from the other."
 
 
 [22]
 This statement is borne out by the record. Lundgren testified that National's price classification brackets were not used in connection with the negotiations for the licensing of Goldwyn pictures. The prices on the Goldwyn pictures, Lundgren stated, were higher than those listed in the classification brackets, and were negotiated "upon the reviewed upward deal on SPANISH MAIN."
 
 
 [23]
 A "run" is the period of time during which a motion picture is licensed to be exhibited at a particular theatre. A "first run" usually produces substantially greater box office receipts and film rentals then all of the "sub-runs" put together. A "clearance" is the period of time agreed upon between the exhibitor licensing a prior run and the distributor of that picture as to the amount of time which must elapse before a picture, being run in one area, may be again run by another exhibitor in that area. It constitutes a contract right. The "availability" of a picture is the first day upon which an exhibitor may commence the exhibition of a picture under his licensing arrangement with the distributor
 
 
 [24]
 While plaintiff is not specifically named in this group of findings, it is a producer and so is included among those who were confronted with this fixed scale
 
 
 [25]
 Defendants also argue that the finding that film buying was centralized in Los Angeles is a "frivolity" which should be brushed side, citing G & P Amusement Co. v. Regent Theatre Co., N.D.Ohio, 107 F.Supp. 453,aff'd per curiam, 6 Cir., 216 F.2d 749. In our view this finding was designed only to round out the district court's description of defendant's circuit buying practices and was not intended to have independent significance.
 
 
 [26]
 National had first-run theatres in nineteen cities having a population of over one hundred thousand. In six of those nineteen cities, plaintiff's pictures were not offered to National because RKO also had a first-run house, or for other reasons
 
 
 [27]
 See Lundgren's testimony, quoted in note 21. Robert Mochrie, employed in plaintiff's distribution department, testified that Zabel never offered to license theatres in closed towns on a separate and distinct basis from those theatres in which the Fox Circuit had competition
 
 
 [28]
 As the Supreme Court said in United States v. Griffith, 334 U.S. 100, 107-108, 68 S.Ct. 941, 945-946, 92 L.Ed. 1236:
 "A man with a monopoly of theatres in any one town commands the entrance for all films into that area. If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors. * * * Though he makes no threat to withhold the business of his closed or monopoly towns unless the distributors give him the exclusive film rights in the towns where he has competitors, the effect is likely to be the same where the two are joined. When the buying power of the entire circuit is used to negotiate films for his competitive as well as his closed, towns, he is using monopoly power to expand his empire. And even if we assume that a specific intent to accomplish that result is absent, he is chargeable in a legal contemplation with that purpose since the end result is the necessary and direct consequence of what he did. * * *"
 
 
 [29]
 The "sliding scale" involved a calculation of theatre expenses and their allocation to each National theatre according to an arbitrary formula. These expenses were supposed to be actual, but there was testimony that they were not. Included among them were sums paid pursuant to joint ownership or operating agreements, circuit administrative expenses, federal excise taxes, and National expenses of defending antitrust suits. Both RKO and National's parent corporation, Twentieth Century Fox, protested "expenses" charged against revenue in computing rentals by the sliding-scale method. Goldwyn asked for an audit of theatre expenses with respect to BEST YEARS OF OUR LIVES, but was refused
 
 
 [30]
 Among these findings were Nos. 54, 77, 101, 155, 166 and 167
 
 
 [31]
 Defendants urge that the only Goldwyn pictures which could possibly have been affected by the practice under discussion are the last two which were brought to market during the 1947 to 1950 period. They point out that these pictures were not offered to National but were "sold away," reasoning therefrom that the practice could have had no adverse effect upon plaintiff. But the application of the "split" system to these two pictures tended to depress the price National was willing to offer. See Royster Drive-In Theatres, Inc. v. American Broadcasting — Paramount Theatres, Inc., 2 Cir., 268 F.2d 246, 250. Thus it was at least a contributing factor in requiring RKO, distributing for plaintiff, to look elsewhere for purchasers, to plaintiff's disadvantage as the court found
 
 
 [32]
 In Paramount, after pointing out, at 334 U.S. 162-163, 68 S.Ct. 931-932, 92 L.Ed. 1260, some of the practical problems involved in applying competitive bidding to the licensing of films, the court said at 164:
 "The system uproots business arrangements and established relationships with no apparent overall benefit to the small independent exhibitor. If each feature must go to the highest responsible bidder, those with the greatest purchasing power would seem to be in a favored position. Those with the longest purse — the exhibitor-defendants and the large circuits — would seem to stand in a preferred position. If in fact they were enabled through the competitive bidding system to take the cream of the business, eliminate the smaller independents, and thus increase their own strategic hold on the industry, they would have the cloak of the court's decree around them for protection. Hence the natural advantage which the larger and financially stronger exhibitors would seem to have in the bidding gives us pause."
 
 
 [33]
 Defendants, on the other hand, do not appear to challenge this finding of fact
 
 
 [34]
 National owned 24.6% of the stock of Golden State and had an ultimate interest of 26.62% in the corporation during the years here in question. National owned 26.69% of the stock of T. & D. Jr. and held an ultimate interest of 31.77%
 
 
 [35]
 National did have two representatives on the Naify boards of directors
 
 
 [36]
 We refer to plaintiff's exhibits Nos. 110 and 115, and associated testimony. Numerous other exhibits bearing upon such contacts between National and the Naify Circuit dealt with years not involved in this suit
 
 
 [37]
 The foregoing findings are contained in finding of fact No. 37. In findings Nos. 38 to 41, the court listed the theatres in which National or a subsidiary, and one or another of many named competitive exhibitors, held joint ownership or operating rights during 1947 to 1950. As to most of these theatres the percentage interest of National or its subsidiary was indicated, the percentage ranging from 25.5% to 90.83%
 
 
 [38]
 The court also found that competition was further restrained and eliminated by the provision of the basic agreement between United Artists and Fox West Coast that neither party would construct or operate theatres in various sections of California except under stipulated conditions. These conditions were that such newly-constructed theatres would be placed into the pool, and that the profits from the operation of such theatres would be divided between the parties
 
 
 [39]
 Since January 1, 1937, Fox West Coast has owned fifty-one per cent of the outstanding shares of Principal Theatres, Inc., which operated twenty-five theatres, seven of which were located in downtown Los Angeles. During the period 1947 through 1949, the court found, a total of $13,766,768.12 in admissions revenue, or 9.58% of the total Fox West Coast admission revenue was derived by Fox West Coast from the operation of the Principal Theatres pool
 
 
 [40]
 In finding of fact No. 38, twenty-six corporations, operating seventy-eight theatres, are listed which, during the 1947 to 1950 period, were putative competitors of National, and in which National held an ownership interest of from 25.5% to 90.83%. This is in addition to National's seventy per cent joint interest in United West Coast, which operated fifty-eight theatres under the joint-ownership arrangement between National and United Artists. Nor do the figures stated above include the Naify Circuit, in which National also had an interest
 
 
 [41]
 See Timken Roller Bearing Co. v. United States, 341 U.S. 593, 597-598, 71 S.Ct. 971, 95 L.Ed. 1199; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 241, 20 S.Ct. 96, 44 L.Ed. 136
 
 
 [42]
 Twentieth Century Fox indirectly participated in, and benefited from, the activities of National and its subsidiaries, through its one hundred per cent ownership of National. In view of our holding stated immediately above, however, we need not decide whether this would be an independent reason for deciding that the findings of fact support the conclusion that Twentieth Century Fox is liable to plaintiff
 
 
 [43]
 Defendants presented this evidence in the form of four studies. The first three of these were studies of box-office revenue per unit and film rental per unit, picture by picture and theatre by theatre on first-runs in National and non-National theatres in, respectively, selected cities of the United States, selected cities of western United States, and in eight groups according to population sizes. The fourth study, really comprising three individual studies, was of performance and treatment of Goldwyn pictures, one by one, in National and RKO first-run theatres in selected cities of the United States, and in cities of varying population size
 On the basis of the first three of these studies, and charts developed therefrom, defendants contend that the film rentals paid by National for the Goldwyn pictures compared favorably to those paid by first-run exhibitors in the larger cities, in relation to box-office receipts. On the basis of the fourth study, defendants conclude that National paid as well or better for the Goldwyn pictures than did RKO, plaintiff's distributing agent.
 
 
 [44]
 As a result of its first study, plaintiff computed its damages as a result of assertedly low rentals paid by National on the five Goldwyn pictures exhibited by National in 1947 to 1950, at $469,000. As a result of the other studies, the aggregate estimated damages were, according to plaintiff: $476,000 (second study), $374,000 (third study), $287,675 (fourth study), and $201,898 (fifth study). In addition to the foregoing, plaintiff computes damages of $169,200 (sixth study), this study being limited to the two Goldwyn pictures, ROSEANNA McCOY and MY FOOLISH HEART, which damage, according to plaintiff, is attributable to defendants' "almost total refusal to license."
 
 
 [45]
 Defendants point out that Mulvey did not take part in any of the negotiations for licensing the Goldwyn pictures to National, and had no first-hand knowledge of what went on. They argue that he was not qualified to express an expert opinion as to actual competitive conditions. They further assert that the questions asked of Mulvey on direct examination did not specify, nor were defendants able to develop on cross-examination, the factual data upon which Mulvey purported to rely
 
 
 [46]
 These two pictures, ROSEANNA McCOY and MY FOOLISH HEART, were not licensed to National
 
 
 [47]
 In its order of October 3, 1956, granting defendants' motion for partial summary judgment, reported in Samuel Goldwyn Productions, Inc. v. Fox West Coast Theatres Corp., N.D.Cal., 146 F.Supp. 905, 906, the court said:
 "The applicability of the three year statute of limitations of Cal.Code of Civil Procedure, § 338(1), see Steiner v. 20th Century-Fox, 9 Cir., 1955, 232 F.2d 190, 194, to this proceeding is not in issue on this motion, and may be assumed for the purposes of this motion to be undisputed."
 
 
 [48]
 Leh v. General Petroleum Corp., S.D. Calif., 208 F.Supp. 289, now on appeal in this court
 
 
 [49]
 Section 5 of the Clayton Act at the time this action was commenced was found at 38 Stat. 731 (1914). It was amended in 1955. See 69 Stat. 283, 15 U.S.C. § 16 (b) (1958)
 
 
 [50]
 As stated earlier in this opinion, the district court rejected this view in granting partial summary judgment for defendants. Samuel Goldwyn Productions, Inc. v. Fox West Coast Theatres Corp., N.D. Cal., 146 F.Supp. 905
 
 
 [51]
 Section 5 read as follows:
 "Whenever any suit or proceeding in equity or criminal prosecution is instituted by the United States to prevent, restrain or punish violations of any of the antitrust laws, the running of the statute of limitations in respect of each and every private right of action arising under said laws and based in whole or in part on any matter complained of in said suit or proceeding shall be suspended during the pendency thereof." (See note 49 above.)
 
 
 [52]
 On June 5, 1950 the Supreme Court affirmed, per curiam, the final judgment of the district court. 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380. Petitions for rehearing were denied October 16, 1950. 340 U.S. 857, 71 S.Ct. 70, 95 L.Ed. 627
 
 
 [53]
 This gives effect to the California three-year statute of limitations. A claim accruing on July 20, 1935 would have been barred on July 21, 1938, by operation of the California three-year statute of limitations, unless the running of the statute was suspended on July 20, 1938, by the filing on that day of the complaint in the Paramount case. Cal.Code Civ.Proc. § 12
 
 
 [54]
 This objective is not expressly stated as such in paragraph 174, but is necessarily to be implied from the allegations of that paragraph concerning the means employed. Paragraph 174 reads:
 "174. By acquiring and maintaining a monopoly of the business of exhibiting motion pictures in areas serving a substantial percentage of the total population of the United States."
 
 
 [55]
 As in the case of the analysis of the Paramount pleadings, this objective is not expressly stated as such in paragraphs 16(a), 17(a) and 18(a), but is necessarily to be implied from the allegations of those paragraphs concerning the means employed. The paragraphs in question read:
 "[16.]a. Agreeing to acquire and maintain, and acquiring and maintaining a monopolistic combine of first and subsequent run theatres for the exhibition of motion pictures;"
 * * * * *
 "[17.]a. That defendants by their predatory tactics, hereinafter mentioned, establish, increase, maintain and perpetuate a monopolistic buying combine of motion picture theatres;"
 * * * * *
 "[18.]a. They acquired an effective monopolistic buying combine by the acquisition, leasing, ownership or management of theatres strategically located throughout the states in which the defendants do business."
 In the non-charging paragraphs of the complaint there are other background allegations which tend to substantiate this view as to the objectives of the asserted combination and monopoly. Among these are the following:
 "The defendants have combined the tremendous buying power arising out of the control of the theatres to purchase film licenses on a non-competitive and monopolistic basis as hereinafter more fully set forth [Paragraph 11].
 "In August of 1925, the parent FOX company, acquired approximately one-third of the common stock of WEST COAST THEATRES, INC., predecessor of the defendant FOX WEST COAST, and in March, 1928, it purchased all of the stock of WESCO CORPORATION (now the defendant NATIONAL), a holding company for theatre operating corporations. From this nucleus FOX WEST COAST and NATIONAL erected the buying combine of operating companies by the predatory means and methods hereinafter alleged." (Paragraph 12)
 
 
 [56]
 Thus, in Paramount, the Supreme Court said, 334 U.S. at page 174, 68 S.Ct. at page 937, 92 L.Ed. 1260:
 "* * * a vertically integrated enterprise, like other aggregations of business units (United States v. Aluminum Co. of America, [2 Cir.,] 148 F.2d 416), will constitute monopoly which, though unexercised, violates the Sherman Act provided a power to exclude competition is coupled with a purpose or intent to do so."
 
 
 [57]
 In the original complaint, as in the amended complaint, National was designated as a subsidiary of Twentieth Century Fox, both being named defendants. Twentieth Century Fox was alleged to be engaged in the business of producing, distributing and exhibiting motion pictures. National was described as a holding company for the theatre interests of the parent company. It was alleged that Twentieth Century Fox was one of the five companies which emerged in the 1920's with production facilities and large theatres holdings. See paragraphs 7(a) and (e), 49, 50 and 126 of the complaint. In paragraph 189 it was alleged, in part:
 "The acquisition of affiliated theatres in different sections and areas of the United States by the producer-exhibitor defendants has resulted in a division of territory between them, so that, in effect, each producer-exhibitor defendant, acting in combination with the other defendants herein, has an independent monopoly of the market for the first-run exhibition of motion pictures in the respective area, or areas, where each operates. * * *"
 In paragraph 198 of the original complaint it was alleged:
 "(198) The monopolization of the exhibition of quality films on first or preferred runs in all sections of the United States where affiliated theatres operate or exist has been brought about by the producer-exhibitor defendants herein through the instrumentality of the ownership, operation and control of affiliated theatres, and as such instrumentality, as aforesaid, theatre ownership and control, coupled with the control of production by the producer-exhibitor defendants, or any of them as hereinafter alleged is illegal as violative of the Sherman Anti-Trust Act."
 
 
 [58]
 It is therefore unnecessary for us to decide whether this is likewise true with regard to conspiracies to exclude independently produced films from affiliated theatres, as charged in other sections of the Paramount complaint. Nor, in view of the disposition which we have made of this matter do we find it necessary to pass upon plaintiff's contention that the Steiner case was wrongly decided. The cogent arguments made in support of that contention we leave for determination in some future litigation in which such a decision may be required
 
 
 [59]
 In the Webster Motor Car Co. v. Packard Motor Car Co. case, D.C., 166 F.Supp. 865, Judge Holtzoff, using a number of previous antitrust suits as guides, concluded that an allowance of from twenty-three to twenty-four per cent of the single damages would constitute a reasonable fee. On the other hand, plaintiff calls attention to the fees allowed in nine cases, in five of which the amount exceeded or nearly equaled the damage award. In plaintiff's remaining four cases, the fee ranged from thirty-four per cent to sixty-seven per cent of the single damages
 
 
 [60]
 Plaintiff's attorneys expended approximately 12,912 hours to and including the trial of the case. The $100,000 fee awarded represents something less than eight dollars an hour for this much time
 
 
 [61]
 See American Crystal Sugar Co. v. Mandeville Island Farms, Inc., 9 Cir., 195 F. 2d 622, 626; North Texas Producers Ass'n v. Young, 5 Cir., 308 F.2d 235, 246
 
 
 [62]
 Plaintiff does not categorically assert that the order is not appealable, indicating only that appealability is "doubtful."
 
 
 [63]
 The rule is so stated in Newton v. Consolidated Gas Co., 265 U.S. 78, 83, 44 S.Ct. 481, 68 L.Ed. 909, and many other cases. However, there are other decisions, including the decision of this court in Kemart Corp. v. Printing Arts Research Lab., Inc., 9 Cir., 232 F.2d 897, 898, 57 A.L.R.2d 1234, where a judgment for costs only has been held not appealable except where the power or right of the court to assess certain items of costs is in dispute,or where there is a claim as to abuse of discretion. The latter version of the rule would seem to encompass any ground on which an appeal would normally be based. See 6 Moore's Federal Practice, 2d ed., § 54.70(5), pages 1308-1313, for a review of the cases.
 
 
 [64]
 "4. Accounting fees:
 "(a) Joseph A. Walsh (10-30-54
 to 8-19-60) $71,850.00
 (b) Price Waterhouse &
 Co. (5-2-55 to 1-58) 36,929.50
 (c) Comptometer Operators
 (1-56 to 3-58) 6,757.95
 (d) Office Machines, Inc.
 (1-24-56 to 12-28-57)
 (Accounting machine
 rental) 1,869.13
 (e) Marchant Co. (11-54
 to 1-56) (Accounting
 machine rental) 375.00"
 
 
 [65]
 Rule 54(d) reads:
 "(d) Costs. Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on one days' notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court."
 28 U.S.C. § 1920, which is also relevant, reads:
 "§ 1920. Taxation of costs
 "A judge or clerk of any court of the United States may tax as costs the following:
 "(1) Fees of the clerk and marshal;
 "(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
 "(3) Fees and disbursements for printing and witnesses;
 "(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
 "(5) Docket fees under section 1923 of this title.
 "A bill of costs shall be filed in the case and upon allowance, included in the judgment or decree."
 
 
 [66]
 To the same effect, see Clapper v. Original Tractor Cab Co., S.D.Ind., 165 F.Supp. 565, 599, reversed on other grounds, 7 Cir., 270 F.2d 616
 
 
 [67]
 Costs against a defendant, in addition to those enumerated in 28 U.S.C. § 1920, are allowable in certain kinds of actions sounding in equity. See Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 164, 59 S. Ct. 777, 83 L.Ed. 1184
 
 
 [68]
 It is unnecessary for us to consider defendants' additional contentions that the allowance for accounting fees was improper because the fees were not authorized by the court before they were incurred, and because there was assertedly no showing what the accounting services were or to what extent the product thereof was used at the trial
 
 
 [69]
 Prior to the 1955 amendment, section 5 of the Clayton Act read, in part:
 "Sec. 5. * * * [A] final judgment or decree hereafter rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, This section shall not apply to consent judgments or decrees entered before any testimony has been taken: Provided further, This section shall not apply to consent judgments or decrees rendered in criminal proceedings or suits in equity, now pending, in which the taking of testimony has been commenced but has not been concluded, provided such judgments or decrees are rendered before any further testimony is taken."
 The text of the present section 5(a) is now found at 69 Stat. 283 (1955), 15 U.S.C. § 16(a) (1958).
 
 
 [70]
 At the same time, Judge Murphy granted the motion for partial summary judgment referred to above opposite note 9. The views of Judge Murphy on both motions are expressed in his reported opinion of October 3, 1956. Samuel Goldwyn Productions, Inc. v. Fox West Coast Theatre Corp., N.D.Cal., 146 F.Supp. 905
 
 
 [71]
 In Emich, 340 U.S. at page 568, 71 S.Ct. at pages 413-414, 95 L.Ed. 534, the court said:
 "We think that Congress intended to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit.